Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued September 18, 2003          Decided November 14, 2003

No. 02-5277

CITY OF ROSEVILLE, ET AL.,
APPELLANTS

v.

GALE A. NORTON, IN HER OFFICIAL CAPACITY AS
UNITED STATES SECRETARY OF INTERIOR, ET AL.,
APPELLEES

————

Appeal from the United States District Court
for the District of Columbia
(No. 02cv00628)

————

*William P. Horn* argued the cause and filed the briefs for appellants. *Barbara A. Miller* and *Harvey A. Levin* entered appearances.

*Stephen P. Collette* was on the brief for *amicus curiae* National Coalition Against Gambling Expansion in support of appellant.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Seth P. Waxman* argued the cause for appellee The United Auburn Indian Community. With him on the brief were *Edward C. DuMont*, *Luke A. Sobota*, and *Howard Dickstein*. *Kirk R. Ruthenberg* and *Nicholas C. Yost* entered appearances.

*Elizabeth Ann Peterson*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With her on the brief was *William B. Lazarus*, Attorney.

Before: ROGERS and ROBERTS, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This appeal involves the intersection of two statutes concerning Indian tribes. The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721 (2003) ("IGRA"), prescribes the conditions under which Indian tribes may engage in commercial gaming on their reservations. The Auburn Indian Restoration Act, 25 U.S.C. §§ 1300*l*–1300*l*–7 (2003) ("AIRA"), restored the Auburn Indian Band located near Sacramento, California to federal recognition as an Indian Tribe and authorized the creation of a new reservation on its behalf. *See id.* §§ 1300*l*, 1300*l*–2. The cities of Roseville and Rocklin, both located near land approved by the Secretary of the Interior as part of the Tribe's new reservation, and Citizens for Safer Communities, a local nonprofit organization (hereafter "the Cities"), challenge the district court's interpretation of section 20 of IGRA. They contend that the plain language of IGRA required the Secretary, prior to deciding the land was eligible to be used for gaming, to find that gaming "would not be detrimental to the surrounding community" and to secure the consent of the Governor. *See* 25 U.S.C. § 2719(b)(1)(A). We hold, in light of IGRA's language, structure, and purpose, that the Auburn Tribe's land qualifies as the "restoration of lands" under IGRA § 20(b)(1)(B)(iii) even though the land is not located on the Tribe's former reservation as of the time the Auburn Tribe lost federal recognition and is being put to a different use than the lands on the former reservation, the Rancheria. Hence, the Secretary was not required to proceed under

§ 20(b)(1)(A) as the Cities contend. Accordingly, we affirm the dismissal of the Cities' IGRA cause of action and, as this is the only issue raised on appeal, we affirm the judgment of the district court.

**I.**

The Auburn Indian Band is a small tribe, numbering somewhere around 247 members, most of whom live near the village of Auburn in central California, not far from Sacramento. The Auburn Band currently has no reservation; in fact, the Auburn Tribe had no federally recognized existence between 1967 and 1994. The Band appears to have been formed when several surviving families of the Maidu and Meiwok Tribes, both devastated by the settlement policies of the nineteenth century, grouped into a small community that survived much of the depredation that came with the settlement of California. In 1917, the federal government provided the Auburn Tribe with a small 20–acre reservation, which was expanded to 40 acres in 1953, known as the Auburn "Rancheria." As part of then-prevailing policies on Indian assimilation, however, Congress withdrew the Auburn Tribe's recognition and terminated its reservation in 1967, distributing most of the Rancheria land in fee to individual holders, pursuant to the terms of the Rancheria Act, Pub. L. No. 85–671 (1958). The policy of attempting to assimilate Indians by terminating federal trust responsibilities has since been repudiated by the President and Congress, and many tribes terminated as part of those policies have now been restored to federal recognition.

Congress restored the Auburn Band's rights as a federally recognized tribe in 1994 and authorized the Secretary of the Interior to take land into trust to serve as the Auburn Tribe's reservation. *See* AIRA, Pub. L. No. 103–434 tit. II (1994), 25 U.S.C. §§ 1300*l*–1300*l*–7 (2003). AIRA directs the Secretary to accept lands located on the Tribe's former reservation into trust, *id.* § 1300*l*–2(b), but also authorizes the Secretary to accept other unencumbered lands located elsewhere in Placer County, *id.* § 1300*l*–2(a). AIRA also references the Secretary's authority, pursuant to the Indian Reorganization Act,

25 U.S.C. § 461 *et seq.*, to take additional land into trust within the tribe's "service area," which includes several neighboring counties, *id.* § 1300*l*–2(a). Under AIRA, all land taken into trust pursuant to its terms "shall be part of the Tribe's reservation." *Id.* § 1300*l*–2(c).

Rather than apply to the Secretary to re-establish their reservation on the Rancheria, most of which land was unavailable because held in fee by individual Indians or non-Indians, the Auburn Tribe applied for three separate parcels of land: one for residential and community use, one for commercial use as a gaming casino, and a third, containing a church within the boundaries of the old reservation, for community use. The Tribe submitted a revised application in 2000, however, to request only the gaming site, reserving the other two sites for later applications. The gaming site consists of 49.21 acres located in an unincorporated portion of Placer County, California, and photographs of the area indicate that the land is flat, barren, and virtually uninhabited. The parties disagree over how far the land is from the Auburn Tribe's Rancheria, but viewing the record most favorably to the Cities, *see Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002), it is at least clear that the land is neither on nor close to the Tribe's former reservation, and is possibly as far as 40 miles away. What is clear, however, is that the land is close to the Cities.

In response to the Bureau of Indian Affairs' notice and request for comments, *see* 25 C.F.R. § 151.11 (2003), the Cities opposed the Auburn Tribe's application, arguing that the casino would increase crime in their communities and interfere with planned residential developments nearby, as well as with the family-oriented nature of the area. Moreover, they argued that because the proposed gaming was to take place on land acquired after the IGRA's effective date of October 17, 1988, the Secretary was not authorized to permit gaming on the land unless she made a threshold determination under IGRA § 20(b)(1)(A), 25 U.S.C. § 2719(b)(1)(A), that the proposed gaming activity "would not be detrimental to the surrounding communities" and obtained the concurrence of the Governor. The Bureau, relying on opinions of two Associate Solicitors of the Interior Department, took the

position that the land was exempt from the threshold no-community-detriment finding normally applicable under IGRA § 20(b)(1)(A) to Indian lands acquired after 1988 because AIRA brought the Auburn Tribe's land within IGRA's exception for a "restoration of lands" to a restored tribe under § 20(b)(1)(B)(iii). The Cities' objections based on local community detriment were therefore not legally relevant, as IGRA does not require a no-community-detriment finding on lands that are part of a "restoration of lands" before the Secretary can authorize gaming. The Cities' objections were not entirely irrelevant, however, because the Bureau considered the Tribe's land a "discretionary" acquisition, and Interior Department regulations, *see* 25 C.F.R. pt. 151, require the Secretary to consider potential land use conflicts and jurisdictional problems. *Id.* §§ 151.10(f), 151.11(a). Additionally, the Secretary must balance the need of a tribe for additional land, the use to which the land will be put, and the distance of the land from the tribe's reservation, before exercising discretion to take new land into trust for Indians. *Id.* §§ 151.10(b), (c); *id.* §§ 151.11(a), (b). The Bureau found that the balance of these factors favored the Auburn Tribe's planned use of the land for gaming. Ultimately, the Secretary, through her designees, agreed with the legal and factual determinations and approved the Tribe's application. Notice was published in the Federal Register of the Secretary's intent to take the land into trust.

The Cities filed suit against the Secretary, other Interior Department officials, and the United States under a variety of legal theories, seeking declaratory and injunctive relief, as well as a decision on the merits of their IGRA cause of action to prevent the Secretary from permitting gaming on the 49 acres to be taken into trust for the Auburn Tribe. As relevant here, the Cities alleged that the Secretary had failed to comply with the requirements of IGRA § 20(b)(1)(A). The Tribe intervened, and the Secretary moved to dismiss the IGRA cause of action based on her interpretation of the "restoration of lands" exception in IGRA § 20(b)(1)(B)(iii). Following the Secretary's agreement to delay taking the land into trust, the district court ruled that "the only reasonable

interpretation" of IGRA's "restoration of lands" exception under § 20(b)(1)(B)(iii) applied to the land that the Secretary had agreed to take into trust for the Tribe. *City of Roseville v. Norton*, 219 F. Supp.2d 130, 157 (D.D.C. 2002). The court dismissed the Cities' IGRA cause of action for failure to state a claim upon which relief can be granted, and also dismissed or entered summary judgment against the Cities on their remaining causes of action.

## II.

The IGRA was enacted in 1987 to regulate gaming on Indian land. It does not treat all Indian land equally. "Class III" gaming, which encompasses most casino-style games, 25 U.S.C. § 2703(8), is generally permitted on Indian reservations, subject to certain conditions not at issue here including a valid Tribal–State compact and a validly enacted tribal ordinance, *id*. § 2710(d). Section 20 of IGRA, 25 U.S.C. § 2719, however, imposes some limits. Section 20(a) creates a prohibition: gaming is not permitted on Indian land taken into trust by the Secretary after IGRA's effective date, October 17, 1988, unless the land borders an existing reservation or is within the last recognized reservation of a tribe that was landless at the time IGRA was enacted (unless the tribe is in Oklahoma, in which case lands bordering its former reservation are exempted as well). This prohibition is subject to two exceptions in § 20(b). The first, § 20(b)(1)(A), allows the Secretary of the Interior to override § 20(a) and permit gaming on a newly acquired parcel when, "after consultation with the Indian tribe and appropriate State and local officials" the Secretary "determines that a gaming establishment . . . would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State . . . concurs . . . ." The second, § 20(b)(1)(B), exempts lands taken into trust as part of the "settlement of a land claim," "the initial reservation of an Indian tribe acknowledged by the Secretary," or the "restoration of lands for an Indian tribe that is restored to federal recognition." §§ 2719(b)(1)(B)(i),

(b)(1)(B)(ii), (b)(1)(B)(iii). The IGRA does not define a "restoration of lands."

On appeal, the Cities contend that the district court erred as a matter of law in holding, contrary to the plain meaning of IGRA § 20(b)(1)(A), that the Secretary was not required to make a threshold determination that the use of the Auburn Tribe's land for gaming would not be detrimental to the surrounding communities and to obtain the Governor's concurrence. The Cities do not challenge the Secretary's authority under AIRA to take the land into trust for the Tribe. Nor do they contend on appeal that the Secretary's decision to accept the Tribe's application improperly balanced the factors set forth in the Department's regulations, 25 C.F.R. pt. 151, by failing to give adequate weight to the Cities' concerns. Thus, the Cities' appeal presents a single question of statutory interpretation. They contend that the Secretary violated IGRA because the Auburn Tribe's acquisition of the 49.21 acres cannot be a "restoration of lands" under IGRA § 20(b)(1)(B)(iii) as the Tribe never owned those acres in the past as part of its former reservation, the Rancheria, and the tract of land is too different from the Rancheria to be a "restoration" of it. IGRA § 20(b)(1)(A) therefore forbids gaming on the land absent a finding by the Secretary, concurred in by the Governor, that gaming will not have a detrimental effect on the local community – a finding the Secretary did not make pursuant to § 20(b)(1)(A). The Cities maintain that the "restoration of lands" exception can bear only one meaning, namely, that lands must be either identical or almost identical to those previously owned in order to be a "restoration," and that that reading is necessitated by the IGRA's overall policy of limiting the expansion of Indian gaming.

### A.

A few preliminary comments on the nature of our review. The district court dismissed the Cities' IGRA cause of action on the merits, holding that IGRA's "restoration of lands" exception applied, and no party has challenged the district

court's decision to interpret the statute *de novo*. All parties urge this court to decide the matter as a question of law. The Secretary, while noting that her interpretation is due deference, and invoking limited deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), in the district court, does not invoke deference now as a basis for affirming the district court, and seeks affirmance of her interpretation of § 20(b)(1)(B)(iii) on the grounds relied upon by the district court.

We hold, in light of IGRA's language, structure, and purpose, that the Auburn Tribe's land qualifies as the "restoration of lands" under IGRA § 20(b)(1)(B)(iii) even though the land is not located on the Tribe's former reservation as of the time the Auburn Tribe lost federal recognition and is being put to a different use than the lands on the former reservation, the Rancheria. The Secretary, therefore, was not required to proceed under § 20(b)(1)(A) as the Cities contend. *See infra* Part II B. This holding is consistent with the Secretary's interpretation. To the extent that the Secretary's interpretation of the "restoration of lands" provision may include nuances regarding its application to Indian lands not acquired pursuant to a restoration act, the court has no occasion to reach the issue of deference to her interpretation in such circumstances. Therefore, we turn to the merits of the Cities' contentions, examining the text of the statutory exception, its context within IGRA, and IGRA's structure and purposes to determine the intent of Congress in enacting the "restoration of land" exception. *See generally Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995); *Engine Mfrs. Ass'n v. U.S. E.P.A.*, 88 F.3d 1075 (D.C. Cir. 1996).

## B.

All parties urge plain meaning constructions of the exception, albeit with different nuances. The Cities, citing Webster's Dictionary, urge the narrowest construction of the word "restoration" as "bring[ing] back to an original state," in light of their view that IGRA is designed to restrict gambling on

Indian reservations and to protect surrounding communities. The Secretary and the Tribe, also referring us to the dictionary, urge an interpretation of the word "restoration" that encompasses the concept of "restitution." The Tribe also points to this meaning of the word in ancient times as encompassing a broader concept of compensation. The Book of Exodus, for instance, at Chapter 22, Verse 1, requires that someone guilty of killing or selling another's stock must "restore five oxen for an ox, and four sheep for a sheep."

No circuit court of appeals has yet had occasion to address the scope of IGRA's "restoration of lands" exception under § 20(b)(1)(B)(iii), and district courts have assumed that lands are "restored" when included in a tribe's restoration act. When the exception has been litigated, the question has usually been whether there can be a "restoration of lands for an Indian tribe restored to federal recognition" even though the recognition of the Tribe and the land grant did not occur as a result of the same statute – implying that when they do it is the paradigm "restoration of lands." For example, in *Confederated Tribes of Coos v. Babbitt*, 116 F. Supp.2d 155, 161–65 (D.D.C. 2000), the court rejected the Secretary's interpretation, since modified, that the "restoration of lands" exception applies only to lands taken into trust pursuant to a statute restoring a tribe to federal recognition, and held that lands a tribe acquires by other means might also qualify under certain circumstances. Similar cases include *Oregon v. Norton*, 271 F. Supp.2d 1270, 1275–80 (D. Or. 2003); *Grand Traverse Band of Ottowa and Chippewa Indians v. United States*, 46 F. Supp.2d 689, 700–09 (W.D.Mich. 1999) ("*Grand Traverse I*"); and *Grand Traverse Band of Ottowa and Chippewa Indians v. United States*, 198 F. Supp.2d 920, 934–37 (W.D.Mich. 2002) ("*Grand Traverse II*"). Even assuming the instant case is not at the center of the paradigm because the AIRA does not identify these particular 49 acres in Placer County, the term "restoration" can nonetheless readily be construed to include lands acquired pursuant to the restoration statute (AIRA) from within the restored tribe's service area designated in the AIRA. Other cases interpreting the exception have also interpreted it broadly, for instance, in

*TOMAC v. Norton,* 193 F. Supp.2d 182, 192–94 (D.D.C. 2002), and *Sault Ste. Marie Tribe v. United States,* 78 F. Supp.2d 699, 705–07 (W.D.Mich. 1999), as well as in *Grand Traverse I*, 46 F. Supp.2d 695–700, and *Grand Traverse II*, 198 F. Supp.2d at 928–34, district courts have read the other term in the exception – "Indian tribe that is restored to federal recognition" – expansively, so as to include tribes whose termination or recognition is accomplished administratively rather than by an act of Congress.

Because the Auburn Tribe's land is located in Placer County, which was a designated area in the AIRA, and thus became, by operation of law, the Tribe's reservation, *see* 25 U.S.C. § 1300*l*–2(c), the court has no occasion to decide whether land obtained by a tribe other than through the tribe's restoration act is the "restoration of lands" for IGRA purposes, nor whether "restored" tribes include those whose termination or recognition has not been the result of congressional action. Instead, the court must decide the ancillary question presented by the Cities' appeal of whether lands identified in a tribe's restoration act as its reservation must meet the additional qualification of prior tribal ownership before the land can be considered a "restoration of lands for an Indian tribe that is restored to federal recognition."

All parties contend that the plain meaning of § 20(b)(1)(B)(iii) controls. The Cities point to the dictionary definition of the word "restore," and contend that the plain meaning of the term "restoration of lands" cannot encompass lands over which a tribe did not exert prior ownership, or which are dissimilar from those the tribe previously owned. Because to "restore" something means to "bring [it] back to an original state," they maintain that the only lands that can be "restored" to the Auburn Tribe are those on its prior reservation, the Rancheria, or lands sufficiently similar in nature that they can be said to bring the reservation back to its "original" state. Other land acquired pursuant to AIRA, such as the 49 acres that the Secretary has agreed to take into trust, are simply "lands acquired by the Secretary in trust for the benefit of an Indian Tribe after October 17, 1988" for which the Auburn Tribe, like any other tribe that

acquires new land, must meet the requirements of IGRA § 20(b)(1)(A) before the land can be used for commercial gaming. The Cities maintain that the narrow reading of the word "restore" is supported by IGRA's general ban on Indian gaming because if a "restoration" of lands is allowed to encompass lands to which a tribe does not demonstrate a prior connection, such as prior ownership, the exception will swallow the rule. However, the Secretary and the Tribe respond with dictionary definitions of their own, contending that "restoration" encompasses the concept of "restitution," such that it can be a "restoration" to give the Auburn Tribe lands to make restitution for past wrongs. They point out that this meaning of the word, even if less common in everyday parlance, is also included in the dictionary, fits far better with the structure of IGRA and the remedial purposes of AIRA, and is supported by AIRA's provision that all lands taken into trust pursuant to the act "shall be part of the Tribe's reservation." 25 U.S.C. § 1300*l*–2(c).

There is much to commend the interpretation of the Secretary and the Auburn Tribe regarding the scope of the "restoration of lands" exception. The IGRA plainly includes exceptions to its general prohibition of gaming on off-reservation sites, and Congress' purpose in enacting IGRA includes the promotion of tribal economic self-sufficiency, *see* 25 U.S.C. § 2702(1), a purpose with which Congress' enactment of AIRA is entirely consistent. Moreover, the syntax of the statute, which discusses not simply the restoration of the lands themselves, but their restoration "for an Indian tribe," fits more comfortably with the concept of restitution. Even the definitions of "restore" the Cities quote in their own brief include the notion of restitution. *See* Appellants' Br. at 14, quoting Webster's II New Riverside University Dictionary p. 1002 (The Riverside Publishing Co. 1994). But, for the reasons advanced by the Cities, a narrower construction of the exception is not without a measure of plausibility. In sum, neither side can prevail by quoting the dictionary.

We turn, therefore, to context, for the court is to "consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme," *Bailey v. United*

*States*, 516 U.S. 137, 145 (1995). The force of the Cities'
interpretation fades upon closer analysis, particularly in light
of the general environment in which IGRA was enacted, its
structure and general purpose. Even assuming that the
Cities' definition of "restore" as to "bring back to an original
state" is the more common meaning of the word, the statuto-
ry context makes broader readings of § 20(b)(1)(B)(iii) more
plausible. That a "restoration of lands" could easily encom-
pass new lands given to a restored tribe to re-establish its
land base and compensate it for historical wrongs is evident
here, where much of the Auburn Tribe's Rancheria is, as a
practical matter, unavailable to it. Further, even under the
Cities' definition of "restore" as to "bring back to an original
state," there would appear to be no reason to limit the
"original state" to 1967, rather than the earlier period before
the Tribe was granted only a 40–acre reservation. Section
20(b)(1)(B)(iii) refers to the restoration of "lands," not the
restoration of a "reservation." The Maidu and Meiwok
Tribes from which the Auburn Tribe descended once occupied
much of central California. For the Cities to now argue that
the 49 acres are a windfall, as if the Tribe's ancestors had
never possessed any more, is ahistorical. Given the history of
Indian tribes' confinement to reservations, it is not reasonable
to suppose that Congress intended "restoration" to be strictly
limited to land constituting a tribe's reservation immediately
before federal recognition was terminated.

The Cities' interpretation is also difficult to reconcile with
IGRA's other provisions. Limiting a "restoration of lands" to
the return of lands on a tribe's prior reservation practically
reads the "restoration of lands" provision out of existence.
As one of the exemptions under § 20(b), the "restoration of
lands" in § 20(b)(1)(B)(iii), unless it is surplusage, must ex-
empt some land that would otherwise fall within the gaming
prohibition of § 20(a). But § 20(a)(2)(B) explicitly excludes
the "last recognized reservation" of a tribe that "has no
reservation on October 17, 1988" from § 20(a)'s prohibition.
Under the Cities' plain meaning interpretation whereby the
only lands that can be part of a "restoration" are those in a
tribe's former reservation, the exception would be virtually

bereft of meaning because gaming on such lands is not prohibited in the first place. If the Auburn Tribe had reacquired some of the land on its former reservation, the Rancheria, it would have no need to look to the "restoration of lands" exception in § 20(b)(1)(B)(iii) in order to use the land for commercial gaming because § 20(a)(2)(B) would have excluded its Rancheria from § 20(a)'s ban on gaming. While a few scenarios might exist where § 20(b)(1)(B)(iii) would remain applicable under the Cities' interpretation (such as in the case of tribes who held other reservations prior to their "last recognized reservation"), the scope of the exemption would be substantially diminished in a manner that would appear inconsistent with Congress' general goal under IGRA of "promoting tribal economic development" and "self-sufficiency," *Diamond Game Enterprises, Inc. v. Reno*, 230 F.3d 365, 366–67 (D.C. Cir. 2000). It is generally presumed that Congress does not intend to enact surplusage, *see Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687, 698 (1995). The difficulty of reassembling a former reservation as a result of the passage of substantial periods of time between the loss of federal recognition and its restoration is illustrated by the experience of the Auburn Tribe: its Rancheria is largely held in fee by individuals and unavailable as a practical matter more than a quarter of a century later. To be given meaningful effect, then, a "restoration of lands" would seem to encompass more than only the return of a tribe's former reservation.

To the extent that the Cities contend, as a fallback position, that, at the very least, land cannot be considered brought "back to its original state" unless it is at least similar to the reservation it replaces, the Cities effectively concede that a broader interpretation of the term "restoration" is appropriate. While this fallback interpretation would still allow the exception in § 20(b)(1)(B)(iii) to retain some meaning independent of § 20(a)(2)(B), it concedes that lands different than those previously held by a tribe can still be part of a "restoration." Indeed, the Cities' view that the Secretary violated IGRA by failing to make a factual determination that

the accepted tract of land was substantially identical to the old Rancheria depends on their view that the 49.21 acres cannot meet this standard because is too geographically distant, considerably more valuable, and to be put to commercial rather than residential use. But to the extent the Cities rely on the notion that the Auburn Tribe's new land cannot be a "restoration" because it is not being used residentially, like the old Rancheria was, their argument is nonsensical. The point of the "restoration of lands" exception is that such lands may be used for commercial gaming; it would make no sense if a tribe's use of land for gaming could defeat the land's eligibility for gaming. Moreover, these considerations undermine the Cities' plain meaning interpretation by admitting that a "restoration of lands" to a tribe can include different lands than those on its former reservation, as occurred here.

Essentially, the Cities maintain that the "restoration of lands" exception cannot be read in a manner that would allow the Auburn Tribe to put together a new reservation that an "established" tribe would not be permitted to acquire, namely, a gaming parcel separate from its residential and community areas. This explains the Cities' reasoning that a broad reading of the exception would swallow the rule. Because the Tribe would not have been permitted to acquire the 49 acres for gaming if its federal recognition had never been terminated, its "restoration" should not allow it greater rights than it otherwise would have enjoyed as a chronologically continuous tribe. This approach is problematic for several reasons. Had the Auburn Tribe never been terminated, it would have had opportunities for development in the intervening years, including the possible acquisition of new land prior to the effective date of IGRA. A "restoration of lands" compensates the Tribe not only for what it lost by the act of termination, but also for opportunities lost in the interim.

The Cities focus therefore on the underlying prohibition in § 20(a) of gaming on "lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988." They maintain that IGRA § 20 was the product of a bill passed by the House of Representatives in the prior legislative session, H.R. 1920, 99th Cong. (2d Sess. 1986), and

that the legislative history and floor remarks on that bill and its Senate counterpart by several Members of Congress, *see* 132 Cong. Rec. H.2012–02 (daily ed. April 21, 1986); *id.* S.15390–02 (daily ed. Oct. 6, 1986), indicate that Congress was opposed to the expansion of Indian gaming beyond tribes' 1988 reservations. This may be true, but neither H.R. 1920 nor its Senate counterpart contained the "restoration of lands" exception, and hence that legislative history, even assuming it could be of persuasive force for what a later Congress enacted, offers little if any insight on how broad an exception Congress made to its gaming-ban policy for restored tribes. The Cities also point to *Sac and Fox Nation v. Norton*, 240 F.3d 1250 (10th Cir. 2001), *cert. denied sub nom. Wyandotte Nation v. Sac and Fox Nation of Missouri*, 534 U.S. 1078 (2002), although their reliance is largely misplaced. In that case, a tribe had acquired land in downtown Kansas City, Missouri, that was located more than two hundred miles from the tribe's principal reservation. The tribe sought permission to use the land for gaming under § 20(a)(1), which exempts land bordering a tribe's "reservation" from § 20(a)'s ban. The Tenth Circuit rejected the Secretary's position that a "reservation" could include land held in trust for an Indian tribe by the federal government for non-residential purposes, reasoning that such a broad reading of the word "reservation" would undermine the anti-gaming-expansion policies of § 20(a). *Id.* 1264–67. By contrast, the Auburn Tribe's 49.21 acres are part of the Tribe's reservation by operation of law, under AIRA, 25 U.S.C. § 1300*l*–2(c), regardless of whether the land falls within IGRA's "restoration of lands" exception in § 20(b)(1)(B)(iii). To the extent, however, that the Tenth Circuit interpreted "reservation" in light of § 20's general limit of gaming on lands acquired by tribes after 1988, the decision in *Sac and Fox Nation* is consistent with the Cities' view that the "restoration of lands" exception be similarly narrowly construed.

The approach of the Tenth Circuit in *Sac and Fox Nation* is not persuasive here. First, Congress rebuked the decision almost immediately, enacting legislation stating that the authority to determine whether land is a "reservation" was

delegated to the Secretary as of the effective date of IGRA. *See* Pub. L. No. 107–63, § 134 (2001). Second, the Cities point to nothing to indicate that Congress contemplated that the Auburn Tribe's reservation would be composed of only one parcel of land. Had the Tribe acquired one tract of land for residential and gaming purposes, the Cities would not want the land considered a "restoration of lands" if the land was not part of the former Rancheria, even if it bordered on the Rancheria. Had the Tribe been able to reacquire the Rancheria, used it solely for gaming, and then acquired, pursuant to the land-acquisition provision in the Indian Reorganization Act, 25 U.S.C. § 465, other land in a different county for residential use, the reacquired Rancheria would be a "restoration of lands" under the Cities' interpretation even though the resulting reservation would conflict with the no-off-reservation-gaming policy of § 20(a).

Even assuming the policy underlying IGRA § 20(a) does support a narrow reading of the "restoration of lands" exception, the IGRA exceptions in § 20(b)(2) as well as AIRA itself all embody policies counseling for a broader reading. The general purpose of IGRA is "promoting tribal economic development" and "self-sufficiency." *Diamond Game Enterprises, Inc. v. Reno*, 230 F.3d at 366–67; 25 U.S.C. § 2702(1). A reading allowing the Auburn Tribe to participate in that economic base furthers this purpose of IGRA while a reading that confines "restoration of lands" to the old reservation, the Rancheria, (most of which is now in the hands of homeowners, many non-Indian, and hence unavailable for development) would likely deny the Tribe this opportunity. The same objective is apparent in AIRA, which directs the Secretary to consult with the tribe regarding a plan for economic development. *See* 25 U.S.C. § 1300*l*–1(a). AIRA's purpose of re-establishing the Auburn Tribe as an economically viable entity would be served by considering the new reservation established under the Restoration Act a "restoration of lands" allowing it to operate a gaming facility.

Indeed, the exceptions in IGRA § 20(b)(1)(B) serve purposes of their own, ensuring that tribes lacking reservations when IGRA was enacted are not disadvantaged relative to

more established ones. The Cities' position, that reading the "restoration of lands" exception to refer only to lands identical or comparable to lands held at the time of termination prevents "new" tribes from acquiring more rights than "old" ones, would frustrate this purpose. A tribe's pre-termination reservation is, as here, not always available. Given the passage of years between termination and restoration of federal recognition of tribes, it is likely that earlier reservation land could not easily be reestablished as a reservation for a restored tribe. Indeed, the Senate Committee Report to AIRA points out that only 22 of the 40 acres in the Auburn Tribe's old reservation were in Indian hands at the time AIRA was enacted, *see* S. Rep. No. 103–340, at 6 (1994). If the "restoration of lands" exception applied only to such lands, the "equalization" purpose of the exception would mean very little in practice. While the Cities' fallback position that substantively similar lands can also be a "restoration" would do less disservice to this purpose, that reading is, for reasons discussed, not a convincing interpretation of the exception.

Furthermore, the fact that IGRA § 20(b)(1)(B)(ii) provides a parallel exception for the "initial reservation of an Indian Tribe acknowledged by the Secretary" supports the broad reading of the "restoration of lands" exception. Acknowledged tribes, which may or may not have been formally recognized by the federal government at some point in the past, are those that gain recognition by administrative, rather than Congressional, action, *see generally* 25 C.F.R. pt. 83. The parallel placement of the two exceptions in the statute, as well as the analogous situation in which restored and acknowledged tribes find themselves, imply that these exceptions should be treated similarly. Yet it would be anomalous for Congress to confine restored tribes to whatever of their pre-termination reservation is available while simultaneously allowing acknowledged tribes to conduct gaming anywhere on their initial reservation. A far more sensible reading is that the "restoration of lands" is to a restored tribe what the "initial reservation" is to an acknowledged tribe: the lands the Secretary takes into trust to re-establish the tribe's economic viability.

The Cities' concern is misplaced in maintaining that only a narrow interpretation of IGRA's "restoration of lands" exception will prevent AIRA from granting the Auburn Tribe "an unlimited, unquestionable and unreviewable right to acquire any tract of land of any size anywhere in Placer County as 'restored' land and commence operation of a casino," Appellants' Br. at 27. To the extent that AIRA gives the Secretary discretion to accept lands into trust within a wide geographical range, it is not all that different from other statutes restoring Indian tribes to federal recognition. *See, e.g.*, Ponca Restoration Act, Pub. L. No. 101–484 § 10(c)(1) (1990); Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act, Pub. L. No. 100–89 § 105(g)(2) (1987); Coquille Restoration Act, Pub. L. No. 101–42 § 5(a) (1989); Klamath Indian Tribe Restoration Act, Pub. L. No. 99–398 § 6 (1986). When Congress has wanted to limit the geographical range in which a restored tribe's reservation can be located, it has done so by specifying a particular tract of land as the restored tribes' reservation. *See, e.g.*, Coos, Lower Umpqua, and Siuslaw Restoration Act, Pub. L. No. 98–481 § 7 (1984). Indeed, the Secretary enjoys considerable discretionary authority to acquire land for Indians under the Indian Reorganization Act, 25 U.S.C. § 465, which authorizes the Secretary "in h[er] discretion, to acquire . . . any interest in lands . . . for the purpose of providing land for Indians." The Secretary then will have considerable authority to take land in Placer county into trust, both under AIRA and the Indian Reorganization Act, regardless of whether those lands constitute a "restoration" for IGRA purposes.

The Cities contend, however, that Congress would never have intended to give the Auburn Tribe such a broad exemption from the no-community-detriment and governor's-consent requirements of § 20(b)(1)(A) as it will have if any land the Tribe acquires in Placer County is automatically a "restoration." While the language of AIRA broadly identifies the entire county as a place in which the Tribe might acquire lands eligible for gaming, the Cities' position ignores that the location and shape of the new reservation is constrained by departmental regulations. AIRA provides that the Secretary "may" take lands in Placer County in trust. *See* 25 U.S.C.

§ 1300*l*-(a). Interior Department regulations require the Secretary to consider numerous factors to guide the exercise of discretion in deciding whether or not to take particular lands into trust for a tribe, including "the need of the . . . tribe for more land," "[t]he purposes for which the land will be used," "potential conflicts of land use," and "jurisdictional problems." *See* 25 C.F.R. §§ 151.10(b), (c), (f), 151.11(a). Those regulations also provide that "as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" and "greater weight" to jurisdictional concerns. *Id.* §§ 151.11(b), (d).

The Cities' real policy objection is that the 49 acres ultimately selected by the Secretary is not an appropriate site for gaming. Although they disagree with the Secretary's determination in weighing the relevant factors in 25 C.F.R. §§ 151.10–151.11, the Cities do not contend on appeal that the Secretary failed to engage in the requisite balancing or acted arbitrarily or capriciously in applying those factors.

Finally, were there any remaining doubt that Congress intended IGRA's "restoration of lands" exception to be read broadly, to encompass more than a tribe's former reservation as of the date of the termination of its federal recognition, the Cities appear to appreciate that their interpretation would not prevail. The Indian Canon of statutory construction would resolve any doubt. The Supreme Court has on numerous occasions noted that ambiguities in federal statutes are to be read liberally in favor of the Indians. *See generally County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation,* 502 U.S. 251, 269 (1992)*; Montana v. Blackfeet Tribe,* 471 U.S. 759, 766 (1985). IGRA is designed to promote the economic viability of Indian Tribes, and AIRA focuses on ensuring the same for the Auburn Tribe. In this context, the Indian canon requires the court to resolve any doubt in favor of the tribe.

To the extent the Cities contend the canon is inappropriately applied to laws disfavoring Indians, pointing to IGRA

§ 20(a), the Cities continue to overlook the role that IGRA's exceptions in § 20(b)(1)(B) play in the statutory scheme, namely to confer a benefit onto tribes that were landless when IGRA was enacted. Neither *Chickasaw Nation v. United States*, 534 U.S. 84, 93–95 (2001), where the Court found no ambiguity, nor *Sac and Fox Nation v. Norton*, 240 F.3d 1250, previously distinguished, which did not invoke the canon, can assist the Cities here. Moreover, the Cities' suggestion that the Indian canon is no longer relevant because it is predicated upon the weakness of, and special trust responsibilities of the federal government for, American Indians, conditions no longer true in an age when tribes have "increasing political clout and sophistication," Appellants' Br. at 29–30, ignores that the Supreme Court has applied the canon even when the federal government is not a party, *e.g.*, *Blackfeet Tribe*, 471 U.S. 759. Hence, even assuming that the purpose behind the canon is more apposite to the interpretation of Indian treaties forced upon tribes then lacking legal sophistication than to third-party suits involving federal statutes, its applicability to ambiguous statutes purporting to benefit Indians is settled.

Accordingly, we hold, as the Secretary has concluded, in light of IGRA's language, structure, and purpose, that the Auburn Tribe's land qualifies as the "restoration of lands" under IGRA § 20(b)(1)(B)(iii) even though the land is not located on the Tribe's former reservation as of the time the Auburn Tribe lost federal recognition and is being put to a different use than the lands on the former reservation, the Rancheria. Hence, the Secretary did not violate IGRA by failing to make a no-detriment finding under § 20(b)(1)(A). Because the Cities lack standing to invoke 25 U.S.C. § 476(f), which protects tribes against agency decisions that diminish the privileges and immunities available to one tribe relative to other federally recognized tribes, *see Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970); *American Federation of Government Employees, AFL–CIO v. Rumsfeld*, 321 F.3d 139, 157–60 (D.C. Cir. 2003), we affirm the dismissal of the Cities' IGRA cause of action and, absent other challenge, we affirm the judgment of the district court.