*709 Opinion by Judge SCHROEDER; Partial Concurrence and Partial Dissent by Judge CALLAHAN.
OPINION
SCHROEDER, Senior Circuit Judge:
The Redding Ranchería (“the Tribe”) is a very small Indian tribe trying to restore the Reservation that was taken away by the United States during the mid-Twentieth century era of assimilation. See City of Roseville v. Norton, 348 F.3d 1020, 1022 (D.C.Cir.2003); see also William C. Canby, American Indian Law in a Nutshell 27-30 (5th ed.2009) (describing the federal government’s general policy of terminating tribal recognition in order to assimilate Indian populations); Felix S. Cohen, Federal Indian Law § 1.06 (2005) (noting that, starting in the 1950s, the federal government began an official “policy of rapid assimilation through termination”). The Tribe also wishes to establish a successful gaming operation on its land. For that purpose, it has asked the Department of the Interior to take into trust a substantial parcel the Tribe recently acquired for the construction and operation of a new gambling casino. The Secretary of the Interi- or (“Secretary”) denied the request.
The Indian Gaming Regulatory Act (“IGRA”) generally bans gaming on lands that tribes acquire after its enactment in 1988, but creates an exception for tribes with restored lands. 25 U.S.C. § 2719. This case concerns the regulations the Secretary of the Interior has promulgated to define and place reasonable limits on the restored lands exception. The agency found the Tribe’s application did not qualify because, at the time it was submitted, the Tribe was operating a modest casino on land that it acquired earlier. The district court granted summary judgment for the government because the Tribe was seeking to operate multiple casinos, something the applicable regulations unquestionably and reasonably are intended to prevent. While the application was pending before the agency, however, the Tribe advised the agency that it was willing to close down its original casino once the new one was in operation. The agency did not meaningfully address the Tribe’s alternative position. We remand to the agency so that it can do so.
FACTS
The Redding Ranchería was first recognized by the United States in 1922, with a reservation of about 30 acres located in rural Northern California. In 1965, however, it was stripped of its federal recognition pursuant to the California Ranchería Act, Pub.L. No. 85-671, 72 Stat. 619 (1958). The act was part of a general effort to assimilate Indians into American society. See City of Roseville, 348 F.3d at 1022. The Tribe eventually joined other California tribes in bringing suit against the United States, see Hardwick v. United States, No. C-79-1710 (N.D.Cal. Dec. 22, 1983), and as part of a resulting settlement, tribal federal recognition was restored in 1984.
The Tribe then embarked on a series of acquisitions to restore lands to its reservation, and, per its request, each has been taken into trust by the United States, for a total of about 8.5 acres. Roughly 2.3 acres were taken into trust for individual tribe members as part of the settlement agreement in Hardwick. The United States accepted the Tribe’s trust-to-trust transfer request for these parcels in 1992, and the Tribe began operating a small casino, known as the Win-River Casino, on the 2.3 acre parcel after entering into a gaming compact with the state of California in 1999. The Tribe has since submitted several additional land requests. The first, begun in 1996, was for a Head Start facili *710 ty, and the application was not completed and accepted until 2009. Another application, submitted in 2000 and also accepted in 2009, was for a burial ground of .5 acres. In 2010, an application for administrative buildings was accepted. According to the Tribe, its land restoration efforts have often been hampered by lack of funds and the unavailability of nearby land.
In 2003, the Tribe submitted a request to the Department of the Interior to take into trust an additional 152 acres (“the Strawberry Fields”), so the Tribe could construct another casino. After the Tribe submitted a completed application on December 22, 2008, it amended the application in July of 2010 to include an additional 80 acres. Shortly before the Secretary denied the application, the Tribe wrote a letter to the agency, dated December 14, 2010, stating the Tribe was willing to close its current gaming facilities once its new facility was built. The Secretary denied the Tribe’s application on December 22, 2010, finding that, under the applicable regulations, the Tribe could not conduct gaming on newly acquired lands because it was already gaming on other lands.
The key statute governing the Tribe’s gaming activities is the portion of IGRA that covers “restored” tribes. Congress passed IGRA in 1988 “as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.” 25 U.S.C. § 2702. IGRA permits Indian tribes to conduct gaming on tribal lands subject to certain limitations. Section 2719(a) prohibits tribes from gaming on lands taken into trust after IGRA’s 1988 passage date, but that section includes Exemptions and Exceptions. Of relevance is section 2719(b)(1)(B), which allows restored tribes to game on any land taken into trust as part of a “restoration of lands” (the “restored lands exception”). There is no dispute that the Tribe is a “restored tribe” within the meaning of the statute. The issue is whether the land in question is “restored land.”
To define and place reasonable limits on the exceptions, the Secretary of the Interi- or, in 2008, promulgated a series of rules implementing section 2719 of IGRA. 25 C.F.R. § 292.1. The purpose of these rules was to “explain to the public how the Department interprets” IGRA’s various exceptions and exemptions, including the restored lands exception. 73 Fed.Reg. 29,-354. Undep the Secretary’s interpretation, lands qualify as “restored” and can thus be used for gaming purposes only if the tribe establishes a sufficient relationship to the land in what the regulations term “modern,” “historical,” and “temporal” connections to the Tribe’s original land. 25 C.F.R. § 292.12. At issue here is only the temporal connection. A tribe can demonstrate a “temporal” connection in one of two ways:
(1) The land is included in the tribe’s first request for newly acquired lands since the tribe was restored to Federal recognition; or
(2) The tribe submitted an application to take the land into trust within 25 years after the tribe was restored to Federal recognition and the tribe is not gaming on other lands.
25 C.F.R. § 292.12(c) (emphasis added). The Strawberry Fields were not included in the Tribe’s first request for newly acquired lands, so subsection (1) does not apply. The application was filed within 25 years of recognition, but because of the last proviso of subsection (2), the Win-River Casino became the stumbling block. The Tribe was operating a casino on other lands.
The application remained pending for more than seven years. Then the Tribe, on December 14, 2010, wrote to the Secretary to advise that it would close the Win- *711 River Casino when the new casino was completed. Eight days later, the Secretary denied the application, stating that “[b]ecause the Tribe cannot meet the standards articulated in Section 292, the Parcels are not eligible for the restored lands exception.” The denial did not address the Tribe’s December 14 letter proposing to close the Win-River Casino.
The Tribe then brought suit in the Northern District of California, challenging the Secretary’s determination that the Strawberry Fields are not covered by the restored lands exception. The Tribe argued that the regulation’s limitation on operating a second casino was unreasonable. The court granted summary judgment in favor of the Secretary, concluding that the Secretary had the power to promulgate regulations under IGRA, that the Secretary’s interpretation of the restored lands exception was reasonable, and that the Secretary did not act arbitrarily and capriciously in denying the Tribe’s request to operate two casinos, but did not address the Tribe’s alternative proposal to close the first casino once the new one was operational.
The Tribe now appeals. It contends that the regulations are arbitrary and capricious in limiting tribes to one casino on restored lands. It further contends that, even if the limitation is reasonable, the Secretary was arbitrary and capricious in denying its application even though it had offered to close the first casino so that the application would not result in more than one casino. We uphold the reasonableness of the regulation itself, but direct the agency to consider whether the regulation bars the Tribe’s moving its casino operation from the old casino to a new one.
DISCUSSION
I. The Regulation is Reasonable
In promulgating the regulation at issue here, the Secretary was implementing the restored lands exception to the general statutory ban on tribes using land acquired after IGRA for gaming. The restored lands exception therefore must be read in the context of IGRA’s general prohibition against gaming on lands acquired after 1988. The exception was not intended to give restored tribes an open-ended license to game on newly acquired lands. Rather, its purpose was to promote parity between established tribes, which had substantial land holdings at the time of IGRA’s passage, and restored tribes, which did not. See City of Roseville, 348 F.3d at 1030. In administering the restored lands exception, the Secretary needs to ensure that tribes do not take advantage of the exception to expand gaming operations unduly and to the detriment of other tribes’ gaming operations.
To that end, the Secretary promulgated a series of requirements a tribe must satisfy in order to demonstrate that newly acquired lands are part of the effort to restore a reservation and are therefore eligible for gaming. To benefit from the restored lands exception, a tribe must establish a “modern,” “historical,” and “temporal” connection to tribal land. 25 C.F.R. § 292.12. Because these factors are general, the regulation further defines each.
The “modern” connection means that the land is within the state or states in which the tribe is currently located and is, by at least one of several measures prescribed by the regulation, in close proximity to the tribe’s other lands. 25 C.F.R. § 292.12(a). The Secretary concluded that the Tribe satisfied this requirement. The Secretary also concluded that the Tribe satisfied the “historical” connection under 25 C.F.R. § 292.12(b) because the land in question is next to historic lands.
*712 In order to establish a “temporal connection,” the tribe must demonstrate either (1) that the land was part of the tribe’s first request for newly acquired lands after being restored to federal recognition, or (2) that it submitted an application to take the land into trust within 25 years after being restored, and that it is not currently gaming on other lands. Id. § 292.12(c). As the Secretary stated in the preamble to 25 C.F.R. § 292.12(c), “the temporal limitation effectuates IGRA’s balancing of the gaming interests of newly acknowledged and/or restored tribes with the interests of nearby tribes and the surrounding community.” 73 Fed.Reg. 29,-367.
In this way, the regulation strikes a balance between allowing restored tribes to game on newly acquired lands, while at the same time protecting the interests of established tribes. Section 292.12(c) allows a tribe to game on any lands that were acquired as part of its first request for lands after regaining federal recognition, but it limits gaming on lands acquired as part of subsequent requests. After a tribe’s first request for land is granted, it can only game on newly acquired lands if it requests that these lands be taken into trust within 25 years of restoration, and it is not already gaming elsewhere. 25 C.F.R. § 292.12(c)(2). As a result, once a restored tribe builds a casino, it cannot build additional casinos on newly acquired lands. Without this limitation, restored tribes would be able to expand their gaming operations indefinitely. This would give them an unfair advantage over established tribes who generally cannot game on any lands acquired after IGRA was passed. 25 U.S.C. § 2719(a).
The Tribe contends that the limitation is nonetheless unreasonable because it is not contained in the statute. The statute, of course, merely creates an exception for restored lands, without attempting to define the term or dictate how it should be administered. Congress authorized the Secretary to promulgate regulations to achieve those purposes, as is standard practice in today’s understanding of administrative law. Thus an agency charged with administering a statute has the power to make rules “to fill any gap left, implicitly or explicitly, by Congress.” Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974).
The Administrative Procedure Act accordingly sets forth procedures by which agencies promulgate rules “to implement, interpret, or prescribe law or policy.” 5 U.S.C. § 551(4). When an agency uses this rule making authority to define a general or ambiguous provision of a statute, its interpretation is owed deference so long as it is reasonable.' United States v. Mead Corp., 533 U.S. 218, 229, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).
We conclude that the Secretary reasonably implemented the restored lands exception, to limit the extent to which a restored tribe may operate gaming facilities on restored land, in order to ensure parity between restored and established tribes. There is nothing unreasonable about the regulation’s intent to prevent restored tribes from acquiring additional land to operate multiple gaming operations.
II. The Indian Canon Does Not Apply
In Indian law there is a canon that, where a statute is not clear, it must be interpreted liberally in favor of Indians. This canon was most recently articulated by the Supreme Court in Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). *713 The Tribe therefore asserts that even if the regulation could be viewed as reasonable, the Blackfeet presumption precludes the Secretary from prohibiting additional gaming on restored lands.
The Tribe points out that no such “numerical limitation” is clearly expressed within the language of the statute. See 25 U.S.C. § 2719(b)(l)(B)(iii). The Tribe’s position is that, because the limitation is contrary to the interests of the Tribe, we must apply the canon to hold that the numerical limitation violates Congressional purpose. The government, on the other hand, points to a competing presumption of deference to agency- interpretation of a statute. See Chevron, 467 U.S. at 845, 104 S.Ct. 2778.
The Tribe’s argument seems foreclosed by precedent in this Circuit. This court has repeatedly “declined to apply [the Indian law canon of construction] in light of competing deference given to an agency charged with the statute’s administration.” Haynes v. United States, 891 F.2d 235, 239 (9th Cir.1989); see also Seldovia Native Ass’n, Inc. v. Lujan, 904 F.2d 1335, 1342 (9th Cir.1990). We have said this is because the Blackfeet presumption is merely a “guideline,” whereas “Chevron is a substantive rule of law.” Williams v. Babbitt, 115 F.3d 657, 663 n. 5 (9th Cir.1997). In this circuit, an agency’s legal authority to interpret a statute appears to trump any practice of construing ambiguous statutory provisions in favor of Indians.
Even if the Blackfeet presumption might be applied in some circumstances in our circuit, however, it would not apply in this case. This is because all tribal interests are not aligned. An interpretation of the restored lands exception that would benefit this particular tribe, by allowing unlimited use of restored land for gaming purposes, would not necessarily benefit other tribes also engaged in gaming. It might well work to their disadvantage.
The canon should not apply in such circumstances. The canon has been applied only when there is a choice between interpretations that would favor Indians on the one hand and state or private actors on the other. For example, in Blackfeet itself, the Supreme Court applied the canon in a dispute between state and tribal interests, interpreting the 1938 Mineral Leasing Act. The Court concluded that the statute should not be read to permit the state of Montana to tax Indian royalty income from mineral leases, because the Act did not expressly authorize state taxation of Indian royalty interests. 471 U.S. at 767, 105 S.Ct. 2399. In the absence of such an express authorization, the statute had to be interpreted in favor of the Indians. This court has explained that the Blackfeet presumption does not apply when tribal interests are adverse because “[t]he government owes the same trust duty to all tribes.” Confederated Tribes of Chehalis Indian Reservation v. Washington, 96 F.3d 334, 340 (9th Cir.1996). It cannot favor one tribe over another. The district court therefore correctly refused to apply the Indian canon in the circumstances of this case.
III. There Has Been No Unexplained Change in Agency Policy
The Tribe argues that the Secretary’s denial of its application was inconsistent with prior agency practice and therefore arbitrary and capricious. The Tribe points’ to a single past agency decision that permitted the Elk Valley Ranchería to game on restored lands even though it was already gaming on other lands. The Elk Valley decision was before the promulgation of 25 C.F.R. § 292.12 in 2008 and before the Tribe’s application was completed in 2010.
*714 It is not entirely clear that the Elk Valley decision would have been any different under the current regulation. Under the current regulation, a tribe may game on lands provided that they are “included in the tribe’s first request for newly acquired lands since the tribe was restored to federal recognition” regardless of whether the tribe is already gaming elsewhere. 25 C.F.R. § 292.12. The administrative decision is a part of our record and states that the lands on which the Elk Valley Ranchería sought to conduct gaming were part of “the first parcels requested by the Tribe to be acquired into trust.”
What is more, an agency is permitted to change its policy so long as it provides some minimal explanation for the change. See Morales-Izquierdo v. Gonzales, 486 F.3d 484, 493 (9th Cir.2007). Even assuming the Elk Valley decision was inconsistent with the current regulation and the agency’s treatment of the Tribe’s application in this case, the agency provided a sufficient explanation for its change of policy. In promulgating 25 C.F.R. § 292.12, the agency stated that it wanted to “explain to the public how the Department interprets th[is] exception[ ].” 73 Fed.Reg. 29,354. It further explained, that the temporal requirement was designed to “effectuate! ] the IGRA’s balancing of the gaming interests of ... restored tribes with the interests of surrounding tribes and the nearby community.” Id. at 29,367. More extensive explanation was not required. See Robles-Urrea v. Holder, 678 F.3d 702, 710 n. 6 (9th Cir.2012) (noting that even a “sparse” explanation suffices).
IV. The Agency Should Have Considered the Tribe’s Alternative Offer to Move All Gaming to the New Casino
Once a restored tribe has acquired restored lands, and built a casino, the regulation bars use of subsequent acquisitions to operate additional casinos. It is undisputed that the Tribe was operating the Win-River Casino when it submitted its application for the new Strawberry Fields casino. The Tribe’s 2008 application thus contemplated the construction of a second casino. There were apparently discussions between the parties, because in December 2010 the Tribe wrote to the Secretary offering to “memorialize” its intent to move its gaming operations from its current location to the Strawberry Fields. The Tribe argues that the Secretary, in denying the Tribe’s application, arbitrarily failed to consider the Tribe’s 2010 representation that it would not operate multiple gaming facilities. The Secretary denied the Tribe’s application without any mention of the Tribe’s offer, although the denial emphasized the specific wording of the regulation that conditions the requisite temporal connection on a finding that the tribe “is not gaming on other land.” 25 C.F.R. § 292.12(c)(2). The district court did not consider the Tribe’s alternative offer and construed its application as if it necessarily contemplated the operation of multiple casinos.
An agency’s decision is arbitrary and capricious if it ignores important considerations or relevant evidence on the record. See Port of Seattle, Wash. v. F.E.R.C., 499 F.3d 1016, 1035 (9th Cir.2007) (citing Motor Vehicle Mfrs. Ass’n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The Secretary did not address the Tribe’s willingness to close its current casino in order to move its gaming operations to one on newly restored lands. The agency now argues, however, that the Secretary’s determination was required by the plain meaning of the regulation.
*715 Under 25 C.F.R. § 292.12(c)(2), land is eligible for gaming if the application is submitted 'within 25 years after the tribe was restored to federal recognition and “the tribe is not gaming on other lands.” The regulation thus has both a 25 year deadline and a prohibition against gaming on other lands. The agency must look to the date on which a tribe submits its application to determine whether it has satisfied the 25 year deadline. The regulation is not clear, however, that the agency must also look to the date of the application to determine whether the tribe has satisfied the prohibition against gaming on other lands. While the regulation could be so interpreted, the agency has so far provided no reason why it should. Allowing a restored tribe to move a casino does not appear to conflict with the statutory purpose of ensuring parity among restored and established tribes. Restored tribes, if allowed to operate an indefinite number of casinos on newly restored lands, would of course have an advantage over established tribes, but it is not clear that allowing restored tribes to move a casino to a different location would necessarily have the same effect.
The agency can point out that we generally defer to an agency’s interpretation of its own regulation. See Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). The administrative proceedings in this case, however, did not address this issue of interpretation, much less provide any reasons for the agency’s current position. The agency presented its position for the first time in its brief, and it offered sparse explanation for it. We need not defer to an agency position when taken for purposes of litigation. See Christopher v. SmithKline Beecham Corp., — U.S. -, 132 S.Ct. 2156, 2166-67, 183 L.Ed.2d 153 (2012) (noting that “an interpretation is not owed deference when it is nothing more than a convenient litigating position or a post hoc rationalizatio[n] advanced by an agency seeking to defend past agency action against attack.”) (internal citations and quotation marks omitted) (alterations in original). The agency’s interpretation on the' administrative record before us lacks explanation or justification.
In remanding to the agency we expedite the agency’s consideration of the Tribe’s alternative proposal. We do not tell the agency what to say. While the dissent may speculate on how and why the agency interprets the regulation, the agency has never addressed these issues. We cannot defer to what the agency has not done.
We accordingly vacate in part the district court’s grant of summary judgment with instructions to remand to the agency to address whether the Tribe should be permitted to construct a new casino to replace the existing one.
CONCLUSION
The judgment of the district court in favor of the government is affirmed insofar as it upholds the Secretary’s denial of the Tribe’s application to operate multiple casinos on' restored lands. The judgment is reversed in part, and the case remanded to the district court with instructions to remand to the agency for consideration of the Tribe’s proposal to close its existing gaming operation upon construction of a new facility.
AFFIRMED in part, REVERSED and REMANDED in part. Each side to bear its own costs.