ROGERS, Circuit Judge,
dissenting.
Congress determined in enacting the Indian Gaming Regulatory Act (“IGRA”) that Indian tribes restored to federal recognition may be eligible for a restoration of lands on which gaming is permitted. 25 U.S.C. § 2719(b)(l)(B)(iii); see also id, § 465. At issue is whether the decisions of the Secretary of the Interior and the National Indian Gaming Commission (“NIGC”) granting the Mechoopda Tribe’s application for a restoration of lands and for gaming on those lands were arbitrary and capricious. A review of the administrative record indicates these decisions are reasonable and supported by substantial evidence of the Tribe’s ample historical and cultural connections to land at issue (the “Chico parcel”). The record demonstrates that the Secretary considered Butte County’s views and its 2006 report and explained why he was not inclined to revisit the 2003 determination by the NIGC and Interior’s Solicitor that the Chi-co parcel would qualify as restored lands. The Secretary’s rationale is self-explanatory: The County’s report addressed only a narrow aspect of the Tribe’s history and did not challenge the expert studies on which 2003 determination relied in addressing the Tribe’s full history. The Secretary’s rationale was elaborated in contemporaneous agency memoranda when the Assistant Secretary for Indian Affairs, who made the decision on behalf of the Secretary to approve the Tribe’s application to take the Chico parcel into trust as a restoration of lands, concluded that the County sought to deprive a federally recognized Tribe of rights protected by law. Accordingly, because as Tourus Records, Inc. v. DEA 259 F.3d 731 (D.C.Cir.2001), instructs, the Secretary neither violated the requirements of 5 U.S.C. § 555(e) nor ignored the County’s views or its 2006 report, and because the challenged decisions are supported by substantial evidence in the record, I would affirm the grant of summary judgment to the Secretary, the NIGC, and the Tribe, and I respectfully dissent.
I.
The background to the Tribe’s application to the Secretary to take the Chico parcel into trust pursuant to section 5 of the Indian Reorganization Act (“IRA”), 25 U.S.C. § 465, sets the context for the County’s request to the Secretary on June 16, 2006 and for the Secretary’s response. The applicable statutes required the Secretary to determine whether the Chico parcel qualified as a “restoration of lands” allowing gaming under section 20 of the IGRA, 25 U.S.C. § 2719(b)(l)(B)(iii). In the Tribe’s case, Interior’s Office of the Solicitor requested that NIGC assume primary responsibility for providing a legal opinion on this question. The Secretary also had to examine the environmental effects of taking the Chico parcel into trust under the National Environmental Policy Act (“NEPA”), 42 U.S.C. §§ 4321-4370f. Only if the “restoration of lands” and environmental determinations favored granting the Tribe’s application could the Secretary act under the IRA to approve the Tribe’s application to take the Chico parcel into *198 trust for, in part, casino gaming. See TOMAC, Taxpayers of Mich. Against Casinos v. Norton, 433 F.3d 852, 856-57 (D.C.Cir.2006). In “mak[ing] any decision or determination ... with respect to a federally recognized Indian tribe,” the Secretary could not subclassify a tribe by denying it privileges and immunities available to other federally recognized tribes. 25 U.S.C. § 476(f).[1]
The County has long been involved with Interior regarding the Tribe’s efforts to locate a parcel of land qualifying as a “restoration of lands” under section 20 of the IGRA. As early as 2002, when Interior was considering the “restoration of lands” determination, a member of the Butte County Board of Supervisors had written to the NIGC urging the Secretary to take the Chico parcel into trust because the Tribe “has historical and cultural ties to the land planned for the reservation,” stating that “[i]t was part of a large area that was to be deeded to the Mechoopda under treaties signed in the mid-1800s,” and that the Tribe’s proposed casino on the Chico parcel “would allow them to reestablish a connection to the soil of their ancestors.” Letter from Curt Josiassen, Member of the Butte County Board of Supervisors (July 26, 2002). The letter also referenced the fact that the County and the Tribe had discussed the proposed gaming site in a series of meetings. Articles in Butte County newspapers emphasized the Tribe’s eon-nection to the Chico parcel. See, e.g., Editorial, It’s a Gamble, but at Least It’s a Chance, The Enterprise-Record, Chico, CA, Apr. 9, 2002 (“Chico and much of Butte County is literally built on the bones of the Mechoopda.”).
The Tribe was originally federally recognized in the Treaty of 1851, in which the United States promised to the Tribe land located near the ranch of General John Bidwell.[2] However, the Treaty was never ratified and the land was not turned over to the Tribe. See Anne H. Currie, Bidwell Ranchería, 36 Cal. Hist. Soc’y Q, 313, 315-16 (Dee.1957). As a result of a change in federal Indian policy and law, the Tribe’s federal recognition was withdrawn in 1967 [3] and assets of its ranchería were distributed. See 32 Fed.Reg. 7981, 7981-82 (June 2, 1967). The Tribe sued and in 1992 was reinstated to its former federal status as part of a stipulated judgment between the Tribe, the United States, and the City of Chico in Butte County, California. See Notice of Reinstatement to Former Status for the Mechoopda Indian Tribe of the Chico Rancheria, 57 Fed.Reg. 19,133 (May 4, 1992); Order for Entry of Judgment and Judgment, Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria, et al. v. United States, No. C-86-3660-VRW (N.D.Cal.1992). The Tribe’s attempt to have the Secretary take a parcel of land into trust in 1996 failed under the Secretary’s then—interpretation *199 of section 20 of the IGRA. However, after litigation required the Secretary to adopt a broader interpretation, the Tribe requested the Secretary to take the Chico parcel into trust in November 2001, finished acquiring the Chico parcel in December 2001, and on March 26, 2002, requested the NIGC to determine whether the Chico parcel would qualify as a gaming site under the restoration of lands provisions of section 20 of the IGRA.
The Tribe’s historical status with respect to the Chico parcel was confirmed in a comprehensive determination by the NIGC in 2003 in which Interior’s Solicitor concurred. The 2003 determination concluded that the Tribe had proven its historical and cultural connection to the Chico parcel and that the parcel qualified as restored Indian lands under IGRA and NIGC regulations and should be taken into trust. See NIGC 2003 Determination at 10-11, 12 (Mar. 14, 2003). The determination considered the factual circumstances of the Tribe’s acquisition of the Chico parcel, the location of the Chico parcel (about ten miles from the Tribe’s former ranche-ría on the Bidwell ranch, the “Chico Ranchería”), and the Tribe’s historical and cultural nexus to it as well as the temporal relationship between the Tribe’s restoration to federal recognition in 1992 and the Tribe’s acquisition of the Chico parcel in 2001, concluding that all of these factors supported finding that taking the Chico parcel into trust would constitute a “restoration of lands” to the Tribe for purposes of IGRA section 20. In reaching this conclusion the determination relied on the key studies of the origins of the Tribe. These included the field notes of ethnologist C. Hart Merriam, who had interviewed Chico Ranchería residents in 1903, 1919, and 1923 regarding the locations of Mechoopda villages; the 2001 declaration of Craig Bates, the curator of ethnography for Yosemite National Park—who had researched and published over one hundred articles and papers on Native Americans, sixteen of which directly related to the history and culture of the Maidu Indians of California, including the Mechoopda Tribe of Chico Ranchería—that the Tribe is the sole surviving group of the Northwestern Valley Maidu Indians and has historical and cultural connections to the Chico parcel; and reports prepared in 2002 by ethnographer and historian Brian Bibby, an expert on California Indian communities, describing connections among the Tribe, the Chico parcel, and the historical villages of the Mechoopda. The 2003 determination noted that the Chico parcel was within the boundaries of historical Mechoopda village locations and within the boundaries of the land promised to the Mechoopda in the unratified Treaty of 1851.
Also part of the administrative record was the Currie report, published in 1957 in the California Historical Society Quarterly, tracing the history of the Mechoopda Tribe since 1849, when General John Bid-well purchased 22,000 acres of land including land the Mechoopda Tribe occupied. See also Editorial, The Enterprise-Record, Apr. 9, 2002 (“The Mechoopda did most of the mining work that made John Bidwell rich and did much of the work on his ranch that allowed him to prosper.”). The 2003 determination explained that although General and Mrs. Bidwell had established a Mechoopda Indian village for their Indian employees, and Mrs. Bidwell had deeded a 26-acre ranchería in trust for the Tribe, this land was lost after the Tribe’s federal recognition was terminated in 1967, and that the city of Chico, California now occupies the site of the Tribe’s former ranchería. Further, the 2003 determination noted that the 1992 stipulated judgment stated the Tribe could not attempt to reestablish the boundaries of its former ranchería.
*200 The Tribe formally applied to the Secretary on March 19, 2004 to take the Chico parcel into trust as restored lands under IGRA section 20. On April 8, 2004, the Secretary issued notice of and sought comment on the Tribe’s application to take the Chico parcel into trust, requesting comments within thirty days from numerous California state and county officials. See 25 C.F.R. § 151.10. On July 28, 2004 the County wrote the Tribe that, in view of its discussions with the Tribe about mitigation measures, the County “withdraws any formal concerns regarding the proposed location of the casino and the placement of the 650 acres of land [i.e., the Chico parcel] into trust status.” Letter from Paul McIntosh, Chief Administrative Officer for Butte County, to Steve C. Santos, Tribal Chairman, Mechoopda Indian Tribe of Chi-co Ranchería (July 23, 2004).
A year later, by letter of August 24, 2005 to the Secretary, the NIGC, and the Solicitor’s Office, the Tribe expressed concern that the County not “stall the Project” by delaying agreement on mitigation measures. In a second letter to the Secretary, dated October 25, 2005, the Tribe reported that after five years of discussion about the Chico parcel and the Tribe’s expenditure of over seven million dollars, the County was now calling for the consideration of other sites.
On March 1, 2006, the County informed the Secretary that it opposed development of a casino on the Chico parcel, noting environmental objections. See Letter from Dennis Whittlesey, Butte County Special Counsel for Gaming, to Gale Norton, Secretary of the Interior (Mar. 1, 2006). However, three months later the County shifted gears, challenging the Tribe’s existence for the first time, and making a new request of the Secretary. It is this request that underlies the County’s challenges to the approval of the Tribe’s application to take the Chico parcel into trust.
II.
By letter of June 16, 2006 to the Secretary, the Board of Supervisors of Butte County asked the Secretary to “reject” the legal determination made in 2003 by the NIGC and the Solicitor that the Mechoop-da Tribe is a historical tribe whose Chico parcel qualifies to be taken into trust as restored lands. Informing the Secretary that the County opposed the Tribe’s application for restored lands, the County advised its position now was that “the tribal membersf’]” only “‘homeland’” was “the former Chico Ranchería” at the Bidwell Ranch and they “cannot demonstrate any ties or connections to any other property.” Letter from Dennis Whittlesey, Butte County Special Counsel for Gaming, to Dirk Kempthorne, Secretary of the Interi- or, at 5 (June 16, 2006) (“County Letter of June 2006”). The letter also stated:
Butte County does not contest the Mechoopda’s federal recognition. Indeed, we acknowledge that the Department of the Interior has the legal right under the Indian Reorganization Act to extend federal recognition to groups of disparate Indians residing in a common place. However, the Mechoopda is not a historical tribe as is documented by the Beckham Report. To the contrary, it was a “Ranchería Tribe” and the only land ever occupied by the people who ultimately were recognized as a tribe was the Bidwell Ranch property set aside for their residency by the Bid-wells.
County Letter of June 2006 at 5.
The Beckham Report, dated January 2006, was submitted to the Secretary on June 16, 2006, and forwarded by the County to the NIGC on July 14, 2006. Prepared by Stephen Dow Beckham, a history *201 professor at Lewis & Clark College in Portland, Oregon, the report addressed the Bidwells’ history, including their efforts to protect Indians and provide lands for them to live on, and the ancestry of the Indians working for them who lived on the Chico Ranchería set aside for them by the Bidwells. Beckham concluded those Indians were “never an Indian tribe with a federal government-to-government relationship,” County Letter of June 2006 at 5 (quoting the Beckham Report at 50), and so were not a historical tribe with ties to the historical Mechoopda. In contrast to the comprehensive historical analysis of the Tribe by the NIGC and the Solicitor in 2003, the Beckham Report focused on the Chico Ranchería and did not address whether the Secretary should take the Chico parcel into trust under section 5 of the IRA. The Report also did not address the Bates, Bibby, or Currie studies relied on in the 2003 determination. Neither did it mention the Tribe’s original federal recognition in 1851. That is, Beckham opined primarily that the Mechoopda’s inclusion of people of mixed ancestry and surviving Indians from other Maidu villages and tribes terminated tribal existence at the Chico Ranchería.
The Secretary responded to the County’s June 16, 2006 request by letter of August 28, 2006, from Acting Deputy Assistant Secretary George T. Skibine. The Secretary acknowledged the County’s opposition to the Tribe’s application to take the Chico parcel into trust and recognized that the County now was requesting the Secretary to reject the 2003 determination that the parcel would qualify as a “restoration of lands” under IGRA section 20. The Secretary declined to do so: “We are not inclined to revisit this decision now because the Office of the Solicitor reviewed this matter in 2003, and concurred in the NIGC’s determination of March 14, 2003.”
In Taurus Records, 259 F.3d 731, this court held that an agency fulfills its obligation under 5 U.S.C. § 555(e) [4] to provide “a brief statement” of the grounds for denying an interested party’s request where internal agency memoranda clarify the agency’s conclusory denial, id. at 737 (quoting 5 U.S.C. § 555(e)), 739. The court explained that the requirement for an agency to provide a “brief statement” serves two purposes: first, to ensure that the agency has given careful consideration to the request, and second, to give the party an opportunity to inform the agency of any errors it may have made and to facilitate judicial review. Id. at 737. The court emphasized, however, that “nothing more than a ‘brief statement’ is necessary” as long as the agency explains “why it chose to do what it did.” Id. (internal quotation marks omitted). In that case the court held the agency’s denial of an in forma pauperis request, challenged as being arbitrary and capricious, would have been insufficient, standing alone, because the conclusory declaration that the re-questor’s affidavit of indigency was “inadequately supported” did not explain why the agency regarded the request as unsupported and was not “ ‘self-explanatory,’ 5 U.S.C. § 555(e)” from the statement’s context. Id. The agency’s statement of denial “providefd] no basis upon which [the court] could conclude that it was the product of reasoned decisionmaking.” Id. However, because internal memoranda “representing] the ‘contemporaneous explana *202 tion of the agency decision’ ” clarified the agency’s rationale, the court determined a remand was unnecessary and affirmed the agency’s denial. Id, at 738 (quoting Camp v. Pitts, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)). The same analysis applies here.
Notwithstanding its brevity, the Secretary’s letter revealed, on its face, familiarity with the substance of the Beckham Report and recognition that the Beckham Report sought to reopen the question of the Tribe’s historical status, a matter comprehensively addressed in the 2003 determination. The Secretary refuted the assertions by the County and the conclusion of the Beckham Report—namely that the Tribe had no identity as a tribe before its federal recognition in 1992, even on the Chico Ranchería—by pointing to the 2003 determination, which addressed the Chico Ranchería Indians’ status and the broader reach of the Tribe’s history, including its federal recognition in 1851, supra note 2. The laconic denial letter also reflected the fact that the Beckham Report did not mention the land being considered for trust status, instead challenging the Tribe’s existence and the ability of Interior to restore any land at all to the Tribe.
The rationale behind the Secretary’s decision is “self-explanatory,” 5 U.S.C. § 555(e), upon comparing the 2003 determination and the Beckham Report. The Beckham Report addressed only a portion of the Tribe’s historical record and did not challenge, much less identify any deficiencies in, the expert studies relied upon in the 2003 determination. The report also did not refer to the Tribe’s broader history. For example, it omitted any mention of the Tribe’s initial recognition in 1851, even thought it took place at the Bidwell Ranch, supra note 2, and it did not otherwise address the legal significance of that status. Given the comprehensive analysis in 2003 based on undisputed expert studies of the Tribe’s history and connection to the Chico parcel, the County’s 2006 submission gave the Secretary no reason to revisit that matter, particularly as the County’s request was based in Interior’s view, as reflected in the administrative record discussed infra, on the outlawed concept of subcategories of federally recognized tribes, subcategories that were thus beyond the Secretary’s authority to recognize. See supra note 1. Rather, in view of the County’s previous efforts to delay approval of the Tribe’s application, the Secretary had little reason to conclude other than that the County’s latest attempt to derail approval presented no basis for revisiting the matter addressed three years earlier in the comprehensive determination by the NIGC and the Solicitor.
Furthermore, the Secretary’s letter “does not stand as the sole ‘explanation’ of the agency’s decisionmaking rationale.” Tourus Records, 259 F.3d at 738. The rationale for the Secretary’s decision not to revisit the matter, and instead to rely on the comprehensive and effectively unchallenged 2003 determination by the NIGC and the Solicitor, was elaborated in contemporaneous documents in the administrative record that were relied upon by the Assistant Secretary for Indian Affairs who, on behalf of the Secretary, made the decision to approve the Tribe’s application. First, Interior’s response to comments during the NEPA proceeding described the County’s position in its August 11, 2006 letter, which restated the views expressed in its June 16, 2006 letter, as “challengfing] the [revised environmental assessment (“REA”)] project site’s historical and cultural significance to the Mechoopda Tribe.” Response to Comments at 10. This response indicated that Interior understood the County and the Beckham Report to be denying the Tribe’s existence at the Chico Ranchería on the thesis that the *203 “modern” Tribe had no connection with the “historical” Mechoopda Tribe that occupied vast areas of Butte County and hence had no historical connection to any land. The County’s June 16, 2006 and February 15, 2008 letters to the Secretary, and its August 11, 2006 letter to the Regional Director of Interior’s Bureau of Indian Affairs, reaffirm the correctness of this interpretation of the Beckham Report as seeking to parse the Tribe’s existence in a manner that undermined its status as a federally recognized tribe.
Second, the Response to Comments described the Beckham Report, the 2003 determination, and the Secretary’s letter declining to revisit that determination, concluding that the Tribe is federally recognized and listed as such pursuant to federal statute and that under a statute enacted in 1994 only Congress can terminate that status. See Response to Comments at 10-11; supra note 1. The response emphasized that the Beckham Report was addressing “[¡Issues regarding tribal membership, historical land ownership and aboriginal territory,” Response to Comments at 10, that the Tribe is now federally recognized, that it “was first recognized as a sovereign tribal entity in 1851, when the United States first executed a treaty, never ratified, with the Tribe,” and that only Congress can terminate the federal recognition of a Tribe, id. at 11. This is a direct response to the assertions of the County and the conclusion of the Beck-ham Report in 2006. The response was prepared by Interior’s Pacific Regional Office, and it was that office's 2007 memorandum recommending that the Chico parcel be taken into trust on which the Secretary, acting through the Assistant Secretary for Indian Affairs, relied when he approved on March 14, 2008 the Tribe’s application to take the Chico parcel into trust as restored lands. Thus, the “brief statement” in the Secretary’s August 28, 2006 letter responding to the County’s request was adequate under 5 U.S.C. § 555(e), because it explained “why [the Secretary] chose to do what [the Secretary] did,” Toums Records, 259 F.3d at 737 (internal quotation marks omitted), and the rationale for the Secretary’s decision to rely on the 2003 determination was self-explanatory. The Beckham Report did not purport to address the Tribe’s history comprehensively as did the 2003 determination and did not suggest the expert studies on which the 2003 determination relied were flawed. Although the court “may not supply a reasoned basis lor the agency’s action that the agency itself has not given, SEC v. Chenery, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947),” the court “will uphold a decision of less than ideal clarity if the agency’s path may reasonably be discerned.” Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); Motor Vehicle Mfrs. Ass’n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Contemporaneous agency memoranda elaborated the Secretary’s rationale, making explicit that what the County and the Beckham Report were suggesting was that the Indians who lived on the Chico Ranchería had no tribal existence and so could show no connection to the Chico parcel or any other land, and thus that the Secretary should reject the 2003 determination and treat the federally recognized Tribe as entitled to diminished privileges compared to other federally recognized tribes. The administrative record further reveals that the Secretary considered the County’s views and the Beckham Report in issuing, through the Assistant Secretary for Indian Affairs, a Finding of No Significant Impact (“FONSI”), stating that “[t]his [FONSI] conclusion is based on *204 the analysis contained in the REA, public comments made on the REA, the response to those comments, and the mitigation imposed.” Carl Artman, Assistant Secretary for Indian Affairs, FONSI for the Proposed Mechoopda Indian Tribe Chico Casino Fee-to-Trust Acquisition, at 19 (Jan. 4, 2008) (emphasis added). Because the NEPA process is a legal requirement with which the Secretary had to comply, the statement that the Secretary based his conclusions on the Response to Comments is not gratuitous.
The Secretary’s response to the County is consistent with our precedent that an agency need not restart its analysis whenever a new report is submitted. Cf. Appalachian Power Co. v. EPA, 249 F.3d 1032, 1059 (D.C.Cir.2001); Pers. Watercraft Indus. Ass’n v. Dep’t of Commerce, 48 F.3d 540, 542-43 (D.C.Cir.1995). Otherwise, an agency could be “reasonably concerned that an unyielding avalanche of information might overwhelm an agency’s ability to reach a final decision,” Village of Bensenville v. FAA, 457 F.3d 52, 71 (D.C.Cir. 2006), or that parties could “behave like Penelope,[5] unravelling each day’s work to start the web again the next day,” Western Coal Traffic League v. ICC, 735 F.2d 1408, 1411 (D.C.Cir.1984). The effect of the County’s 2006 submission of the Beck-ham Report was to ask the Secretary to start the fee-to-trust process for the Chico parcel all over again, when the record shows the County had opportunities, and took advantage of them, to make its views known before and after the 2003 legal determination was rendered. Given the limited analysis in the Beckham Report, the Secretary could reasonably decide, for the reasons the contemporaneous administrative record reveals, to rely on the expert evidence assembled by the NIGC in preparing the comprehensive 2003 determination showing the Tribe’s historical connection to the Chico parcel. See City of Roseville v. Norton, 348 F.3d 1020, 1027 (D.C.Cir.2003). Although the Secretary did not publish his final decision of March 14, 2008 to take the Chico parcel into trust until May 8, 2008, that did not mean the County’s 2006 submissions required the Secretary, like Penelope, to begin anew an examination of the issue of the Tribe’s status as a historical tribe with connections to the Chico parcel, a matter previously considered in a comprehensive determination by the NIGC and the Solicitor that remained effectively unchallenged.
III.
Construing the County’s June 16, 2006 letter as a challenge to the restored lands determination of 2003, rather than to the Tribe’s existence, the County fails to show that Interior’s determination that the Me-choopda Tribe has a significant historical and cultural nexus to the Chico parcel was arbitrary and capricious. In this “ ‘classic example of a factual dispute the resolution of which implicates substantial agency expertise,’ ” the court “only inquire[s] whether the agencies have based their policy choices on reasonable expert evidence,” and “because the agencies have relied upon sufficient expert evidence to establish a rational connection between the facts and the choice made, it was not arbitrary and capricious for them” to weigh the competing expert opinions as they did. Wis. Valley Improvement Co. v. FERC, 236 F.3d 738, 747 (D.C.Cir.2001) (quoting Marsh v. Or. Natural Res. Council, 490 *205 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)) (internal quotation marks and citation omitted). The Secretary and the NIGC satisfied their obligations under the Administrative Procedure Act, 5 U.S.C. § 706, by “enabling] [the court] to see what major issues of policy were ventilated ... and why the agency reacted to them as it did.” Milk Indus. Found. v. Glickman, 132 F.3d 1467, 1476 (D.C.Cir.1998) (quoting Republican Nat’l Comm. v. Fed. Election Comm’n, 76 F.3d 400, 407 (D.C.Cir.1996)) (ellipsis in original). The County failed to show that the challenged decisions were not based on consideration of the relevant factors, much less that its views or the Beckham Report were ignored or unevaluated. See State Farm, 463 U.S. at 43, 103 S.Ct. 2856; cf. e.g., City of Waukesha v. EPA, 320 F.3d 228, 257-58 (D.C.Cir.2003).
The County’s contentions reduce to an argument that the Tribe, descending from Indians who worked for the Bidwells in the mid-nineteenth century, lacks a connection to the historical Mechoopda Tribe and thus lacks a connection to the Chico parcel. The administrative record is replete with evidence that establishes the Tribe is the historical Mechoopda tribe with the requisite connections. The 2003 determination cited expert reports and materials that the Beckham Report did not consider or challenge, and the Beckham Report omitted mention of the Tribe’s federal recognition in the unratified 1851 Treaty and its significance. Neither Currie nor Bates nor Bib-by, who reviewed Merriam’s field work, concluded the Tribe had no relation to the historical Mechoopda Tribe. These experts instead viewed the Tribe as connected to the historical Mechoopda Tribe. The County’s fundamental argument that the Tribe lost a connection to the historical Mechoopda Tribe by incorporating people of mixed race and Indians from Northwestern Valley Maidu villages and other tribes finds no support in the law. See, e.g., City of Roseville, 348 F.3d at 1022. Moreover, the records cited in the Beck-ham Report did not show that the Tribe included people with no Indian ancestry (except for some spouses), but rather that many tribal members identified their ancestors as Mechoopda Tribe members or survivors of other Maidu tribes from the region.
Looking to the full historical reach of the Mechoopda and Northwestern Valley Maidu, rather than narrowly to the time at the Chico Ranchería, was not arbitrary or capricious. See id. at 1027. In submitting the Beckham Report the County did not suggest that it represented more than another view of a limited aspect of the historical record considered in the 2003 determination by the NIGC and the Solicitor. Even in challenging the Bibby Report in its August 11, 2006 letter, the County cited only the Beckham Report and ignored the other expert reports relied upon in the 2003 determination. Both the Secretary’s August 28, 2006 letter and contemporaneous agency memoranda revealed familiarity with the County’s views and the substance of the Beckham Report, and the Secretary, through the Assistant Secretary for Indian Affairs, in approving the Tribe’s application relied on the agency commentary addressing the report’s (and thus the County’s) approach. The Secretary and the NIGC reasonably looked to the full history of the Mechoopda and Northwestern Valley Maidu rather than simply the story of the Chico Ranchería, as the Beck-ham Report did. See id. at 1027.
Accordingly, because the court, contrary to our precedent in Tourus Records, in finding a violation of 5 U.S.C. § 555(e) turns a blind eye to the evidence in the administrative record that explains the Secretary’s decision not to revisit the matter addressed in the 2003 determination, *206 and because the challenged decisions by the Secretary and the NIGC are supported by substantial evidence in the record, I would affirm the grant of summary judgment to the Secretary, the NIGC, and the Tribe, and I respectfully dissent.

.Section 476(f) provides:
Departments or agencies ... shall not promulgate any regulation or make any decision or determination ... with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.
25 U.S.C. § 476(f). See also 25 U.S.C. § 476(g); 25 U.S.C. § 479a, Pub.L. 103-454, 108 Stat. 4791 Note (1994); 70 Fed.Reg. 71,-194, 71,195 (Nov. 25, 2005).

. See Treaty Made and Concluded at Bid-well's Ranch, on Chico Creek, August 1, 1851, Between O.M. Wozencraft, United States Indian Agent, and the Chiefs, Captains and Head Men of the Mi-Chop-Da, Es Kuin, etc., Tribes of Indians.

. See California Ranchería Act, Pub.L. No. 85-671, 72 Stat. 619 (1958), amended by Pub.L. No. 88- 419, 78 Stat. 390 (1964).

. Section 555(e) provides:
Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial,
5 U.S.C. § 555(e).

. So every day she wove on the great loom— but every night by torchlight she unwove it; and so for three years she deceived the Akhaians.
Homer, The Odyssey, Book II, lines 112-114 (Robert Fitzgerald trans.1961).