# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 10, 2009        Decided July 13, 2010

No. 09-5179

BUTTE COUNTY, CALIFORNIA,
APPELLANT

v.

PHILIP N. HOGEN, CHAIRMAN, NATIONAL INDIAN GAMING
COMMISSION, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00519)

---

*Dennis J. Whittlesey* argued the cause and filed the briefs for appellant. *Bruce S. Alpert* entered an appearance.

*Robert P. Stockman*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were John C. Cruden, Acting Assistant Attorney General, and *Aaron P. Avila*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Nicholas C. Yost* argued the cause for appellee Mechoopda Indian Tribe of Chico Rancheria, California. With him on the brief were *Michael J. Anderson* and *Matthew J. Kelly*.

Before: ROGERS and GRIFFITH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

Dissenting opinion filed by *Circuit Judge* ROGERS.

I.

RANDOLPH, *Senior Circuit Judge*: The issue in this appeal from the judgment of the district court arises from efforts of the Mechoopda Indian Tribe of Chico Rancheria in Butte County, California, to obtain federal approval to conduct gaming operations. The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, permits federally-recognized Indian tribes to conduct gaming on "Indian lands." The Act defines "Indian lands" to mean all lands within any Indian reservation and "any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe . . . ." *Id*. § 2703(4). Indian gaming is not permitted on "newly acquired lands" – that is, lands the Secretary of the Interior took into trust for a tribe after October 17, 1988, when the Act went into effect. An exception to this bar allows Indian gaming on lands the Secretary takes into trust after the 1988 date "as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition." *Id.* § 2719(b)(1)(B)(iii).

The Mechoopda Tribe has been restored to federal recognition. The issue at the administrative level was whether land the Tribe purchased and offered to the Department of the Interior to take into trust for its benefit qualified as restored lands. The Act does not define "restoration of lands." The Interior Department and the agency largely responsible for regulating Indian gaming – the National Indian Gaming

Commission – believed that any lands "located within the areas historically occupied by the tribes are properly considered to be lands taken into trust as part of the restoration of lands." *Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney for W. Dist. of Mich.*, 46 F. Supp.2d 689, 701 (W.D. Mich.1999). Shortly after final agency action in this case, the Interior Department codified its view in regulations requiring, among other things, that a tribe "demonstrate a significant historical connection to the land." 25 C.F.R. § 292.12(b).[1]

The Mechoopda Tribe had approximately 400 enrolled members when this case began. Most lived in or near what is now Chico, California, the largest city in Butte County in the north-central portion of the state. The Tribe traces its history to a "rancheria" in Chico. In 1849, John Bidwell, a wealthy California businessman and politician, purchased a 22,000-acre ranch and hired Indians to live and work there. When Bidwell died, he left the ranch to his wife. Between 1909 and 1918 Mrs. Bidwell conveyed 26 acres of the ranch where the Indians were living – the "rancheria" – to a private board in trust for the Indians. The United States took over as trustee of the rancheria in 1939. Acting pursuant to the California Rancheria Act, Pub. L. No. 85-671 (1958), the government terminated the Mechoopda Tribe's recognition in 1967 and ended the trust status of the land. *See* Notice of Termination, 32 Fed. Reg. 7981 (June 2, 1967).

---

[1] If the tribe regained recognition through federal legislation and the legislation authorized the Interior Secretary to take particular parcels of land into trust for the tribe, the Secretary will consider those lands "restored." 25 C.F.R. § 292.11(a)(1). That situation, not present here, describes *City of Roseville v. Norton*, 348 F.3d 1020 (D.C. Cir. 2003).

The Tribe brought a lawsuit contesting its termination. The suit ended when the government and the Tribe entered into a settlement agreement. As the settlement agreement provided, the government restored the Tribe to federal recognition in 1992. *See* Notice of Reinstatement, 57 Fed. Reg. 19,133 (May 4, 1992). The settlement agreement also forbade the Tribe from reestablishing the boundaries of the rancheria.

In 2001, the Tribe purchased a 645-acre parcel of land in Butte County. The Tribe's plan was to have the government take the land in trust so that the Tribe could develop and operate a casino there. The parcel is located approximately 10 miles from the area of the former rancheria, which is in the center of the city of Chico. In addition to requesting the Secretary to take the parcel into trust for the Tribe's benefit, the Tribe submitted applications to the Gaming Commission for review of a gaming management contract and for approval of a gaming ordinance.

The matter was initially referred to the Office of the General Counsel for the Gaming Commission to prepare an advisory legal opinion on whether gaming on the land would be permissible – that is, whether the land, if taken into trust, would qualify under the restored lands exception. Relying on material the Tribe provided, Acting Deputy Counsel Coleman concluded that the Tribe had a "historical and cultural nexus" to the proposed gaming site that was "sufficient to show that the parcel was not merely an acquisition but a restoration of previously used lands." Her conclusion rested, in part, on the fact that the proposed gaming site was within the boundaries of the Mechoopda villages before the Mechoopda relocated to the Bidwell ranch. Her memorandum also indicated that the proposed site was within land that was promised the Mechoopda by an unratified treaty of 1851. There was other evidence showing the historical and cultural significance of the land to the Mechoopda. The memorandum stated that the Interior

Department's Office of the Solicitor concurred in her conclusion.

Coleman's memorandum was dated March 14, 2003. The Secretary did not make a final decision to take the land into trust until May 8, 2008. In the interim, on June 16, 2006, the attorney for Butte County wrote to the Secretary to dispute Coleman's opinion. The County objected to Coleman's conclusion that the Tribe had a historic connection to the gaming site. As the County saw it, the tribe that worked and lived on the Bidwell Ranch, and from whom the modern Tribe is descended, was not the same tribe as the historic tribe that had allegedly occupied the gaming site. Rather, the people residing at the ranch were a disparate group of Indians from many tribes. The County urged that the only land to which the tribal members could show a common connection was on the site of the former the Bidwell Ranch.

To support its assertions, the County attached a report prepared by its consultant, Dr. Stephen Dow Beckham, a professor of history at Lewis & Clark College. The report provided a history of the Bidwell Ranch and those who worked and resided there. Beckham cited the findings of a Bureau of Indian Affairs employee who visited the ranch in 1914. The BIA employee concluded that the Indians did not "belong to any particular band, but are remnants of various small bands, originally living in Butte and nearby counties." Beckham's report also included a detailed account of the families who resided at the ranch between 1928 and 1933. A significant number of these individuals belonged to a tribe interchangeably referred to as Michopda, Mishopda, or Mi-Cho-Da. While this is the historic tribe discussed in Coleman's analysis, Beckham found that many of the ranch Indians were from other tribes – his report lists members of the Wailaki, Concow, Winton, Yuki, Pit River, and Sioux tribes. Why the Indians of the Bidwell

Ranch ultimately assumed the name "Mechoopda" – presumably a variant of the "Michopda" tribe from which some of them were descended – is unclear.

The Acting Deputy Assistant Secretary for Policy and Economic Development responded to the County in a short rejection letter. The letter, dated August 28, 2006, stated: "[Y]ou ask that the Department reject the March 14, 2003, determination of the National Indian Gaming Commission (NIGC) that the parcel proposed to be taken into trust would qualify as 'restored land[.]' . . . We are not inclined to revisit this decision now because the Office of the Solicitor reviewed this matter in 2003, and concurred in the NIGC's determination of March 14, 2003." There is no indication that the Interior Department ever revisited this determination and actually considered the County's evidence.

On February 8, 2007, the Gaming Commission approved the Tribe's gaming ordinance, indicating that the approval was "only for gaming on Indian Lands." On May 8, 2008, the Secretary published in the Federal Register his final decision to take the Tribe's land into trust.[2] The County filed an action claiming that both agency actions were arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706. The district court granted summary judgment in favor of the agencies, ruling that the agencies had considered "the necessary factors," and the County appealed.

## II.

The case boils down to several straightforward propositions of administrative law. We have what is known as informal

---

[2] The Secretary has stayed the land conveyance pending the outcome of this litigation.

agency adjudication. Governing procedural rules, derived mainly from § 555 of the APA, 5 U.S.C. § 555, and the Due Process Clause, are few. Even so, agency decisions in informal adjudication are subject to judicial review under § 706 of the APA. *See, e.g., Reliance Elec. Co. v. Consumer Prod. Safety Comm'n*, 924 F.2d 274, 277 (D.C. Cir. 1991). If the agency decision is arbitrary, capricious or an abuse of discretion it must be set aside.

Two legal propositions are important to the disposition of this case.

First, under § 555(e), the agency must provide an interested party – here Butte County – with a "brief statement of the grounds for denial" of the party's request. As this court held in *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001), the agency must explain why it decided to act as it did. The agency's statement must be one of "reasoning"; it must not be just a "conclusion"; it must "articulate a satisfactory explanation" for its action. 259 F.3d at 737 (*quoting* Henry J. Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 222, and *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Second, an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706. *See, e.g., State Farm*, 463 U.S. at 43; *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009). This proposition may be deduced from case law applying the substantial evidence test, under which an agency cannot ignore evidence contradicting its position. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88 (1951). Although we are dealing

with the question whether agency action is arbitrary or capricious, "in their application to the requirement of factual support the substantial evidence test and the arbitrary or capricious test are one and the same." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984); *accord Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 243 (D.C. Cir. 2008).

The Interior Department managed to violate the minimal procedural requirements § 555(e) imposed. When Butte County furnished the Interior Secretary's office with a copy of the Beckham Report and gave numerous reasons why the Tribe's land did not constitute "restored land," that issue was still pending before the Secretary. The Secretary's final determination did not come until two years later, on March 14, 2008.[3] Yet the entirety of Interior's response to Butte County was this: "We are not inclined to revisit this decision [the opinion of the Gaming Commission] now because the Office of the Solicitor reviewed this matter in 2003, and concurred in the NIGC's determination of March 14, 2003."

This response violates § 555(e) for the same reason the response in *Tourus Records* violated that provision. The response "provides no basis upon which we could conclude that

---

[3] According to agency guidelines, whether lands qualify as restored "is a decision made by the Secretary when he or she decides to take land into trust for gaming"; Indian lands opinions are prepared because the agencies are "in need, from time to time, for legal advice." *See* Memorandum of Agreement Between the National Indian Gaming Commission and the Department of the Interior. Indian lands opinions are "advisory in nature and thus do not legally bind the persons vested with the authority to make final agency decisions." *See* Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29,354, 29,372 (May 20, 2008).

it was the product of reasoned decisionmaking." 259 F.3d at 737. It had all the explanatory power of the reply of Bartelby the Scrivener to his employer: "I would prefer not to."[4] Which is to say, it provided no explanation.

Interior's response was also arbitrary. Reasoned decisionmaking is not a procedural requirement. *Cross-Sound Ferry Servs., Inc. v. ICC*, 738 F.2d 481, 487 (D.C. Cir. 1984). It stems directly from § 706 of the APA. That much was made clear in another informal adjudication case – *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). Interior's response speaks as if the Secretary had already decided the issues – "We are not inclined to *revisit*" the matter – when in fact the matter remained pending. The rest of the response is senseless. So what if the Solicitor had reviewed the Gaming Commission's decision in 2003 and agreed with it? The Secretary had yet to decide whether he agreed, which is what counted.[5] The very point of Butte County's submission

---

[4] The first of many such exchanges continued thus:

"Prefer not to," echoed I, rising in high excitement, and crossing the room with a stride. "What do you mean? Are you moon-struck? I want you to help me compare this sheet here — take it," and I thrust it towards him.

"I would prefer not to," said he.

Herman Melville, *Bartleby, the Scrivener: A Story of Wall Street* 10 (Dover 1990) (1853).

[5] It is not correct to say, as the dissent does, that by the time the County submitted its letter, the issue had been decided and that the County was asking the Secretary to "reopen" the matter. Dissenting Op. at 10. The fact is that the Secretary did not make a decision until two years after the County sent the letter. (The determination in this case was actually made by the Assistant Secretary – Indian Affairs, to

was that the information it submitted called into doubt the judgment of the Gaming Commission. To refuse to evaluate that information because the Solicitor – who never looked at it – agreed with the Gaming Commission is totally irrational.

All that remains is Interior's argument that several statements in an environmental assessment[6] supplied the missing reasoning and showed that the Secretary in fact did take into account the County's evidentiary submission. The environmental assessment came after Interior had advised the County that it would not revisit the restored lands question. There is nothing to indicate that it changed its mind; in fact the environmental assessment relied on the response to the County attorney. And it added that whether the Tribe's newly-acquired lands qualified as restored lands was irrelevant to the question being addressed – namely, whether the Secretary's taking the lands into trust to allow the Tribe to operate a casino there would have a significant environmental impact. The only other point in the environmental assessment was that Interior could not rescind the federally-recognized status of the Tribe. This comment and the others were responsive to an August 2006 letter from a Butte County administrator dealing with environmental issues. But the comment was not responsive to the arguments raised in the County attorney's letter regarding restoration of the lands.

---

whom the Secretary had delegated authority. *See* 209 Departmental Manual 8.1. The Solicitor may have made up his mind but the Secretary did not delegate decisionmaking authority to him. *See* note 3, *supra*.)

[6] Environmental assessments are done to determine whether the agency needs to prepare an environmental impact statement for major federal action pursuant to the National Environmental Policy Act, 42 U.S.C. § 4232(C). *See Humane Soc. of the United States*, 840 F.2d 45, 61–62 (D.C. Cir. 1988).

According to our dissenting colleague, the environmental assessment "indicated that Interior understood the County and the Beckham Report to be denying the Tribe's existence at the Chico Rancheria on the thesis that the 'modern' Tribe had no connection with the 'historical' Mechoopda Tribe that occupied vast areas of Butte County and hence had no historical connection to [the historical tribe's] land." Dissenting Op. at 12. But the County attorney's letter submitted with the Beckham Report clearly states that the County challenged Coleman's restored lands opinion and "[did] not contest the Mechoopda's federal recognition." Rather, it argued that "the only land ever occupied by the people who ultimately were recognized as a tribe was the Bidwell Ranch property . . . . [T]he tribal members cannot demonstrate any ties or connections to any other property." The thesis of the Beckham Report, as the dissent appears to recognize at one point, goes entirely to the restored lands issue by supporting the County's argument that the Tribe had no connection to any land other than its former rancheria. The later letter from the Butte County administrator did, in fact, challenge the Tribe's status, which explains why the environmental assessment advised the County that recognition was irreversible. But that point does not speak at all to the Tribe's historic connection with the land in question.

Our dissenting colleague provides her own analysis of the Beckham Report and concludes that it does not undermine the evidence the Tribe submitted. We are not so sure, but that is not the point. An "agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50 (*citing SEC v. Chenery*, 332 U.S. 194, 196–97 (1947)). The Secretary mentioned none of the dissent's reasons for rejecting the Beckham Report. The Secretary simply refused to give the County an audience.

For all of these reasons, we set aside the Secretary's final action to take the Tribe's lands into trust.[7] The case is remanded for further proceedings consistent with this opinion.

*So Ordered.*

---

[7] The County also asks us to set aside the Gaming Commission's approval of the Tribe's gaming ordinance. The theory apparently is that in approving the ordinance, the Commission determined that the Tribe's land qualified as restored land. But the Commission's letter of approval, which came well before the Secretary's final decision regarding the land, belies this theory. The letter simply stated that the Commission approved the ordinance "only for gaming on Indian Lands," without stating whether the land the Tribe had purchased would wind up in that category. In light of our decision vacating the Secretary's land restoration determination, the Commission's approval therefore has no effect and we see no reason to vacate it. The dissent apparently agrees.

ROGERS, *Circuit Judge*, dissenting: Congress determined in enacting the Indian Gaming Regulatory Act ("IGRA") that Indian tribes restored to federal recognition may be eligible for a restoration of lands on which gaming is permitted. 25 U.S.C. § 2719(b)(1)(B)(iii); *see also id.* § 465. At issue is whether the decisions of the Secretary of the Interior and the National Indian Gaming Commission ("NIGC") granting the Mechoopda Tribe's application for a restoration of lands and for gaming on those lands were arbitrary and capricious. A review of the administrative record indicates these decisions are reasonable and supported by substantial evidence of the Tribe's ample historical and cultural connections to land at issue (the "Chico parcel"). The record demonstrates that the Secretary considered Butte County's views and its 2006 report and explained why he was not inclined to revisit the 2003 determination by the NIGC and Interior's Solicitor that the Chico parcel would qualify as restored lands. The Secretary's rationale is self-explanatory: The County's report addressed only a narrow aspect of the Tribe's history and did not challenge the expert studies on which 2003 determination relied in addressing the Tribe's full history. The Secretary's rationale was elaborated in contemporaneous agency memoranda when the Assistant Secretary for Indian Affairs, who made the decision on behalf of the Secretary to approve the Tribe's application to take the Chico parcel into trust as a restoration of lands, concluded that the County sought to deprive a federally recognized Tribe of rights protected by law. Accordingly, because as *Tourus Records, Inc. v. DEA*, 259 F.3d 731 (D.C. Cir. 2001), instructs, the Secretary neither violated the requirements of 5 U.S.C. § 555(e) nor ignored the County's views or its 2006 report, and because the challenged decisions are supported by substantial evidence in the record, I would affirm the grant of summary judgment to the Secretary, the NIGC, and the Tribe, and I respectfully dissent.

2

## I.

The background to the Tribe's application to the Secretary to take the Chico parcel into trust pursuant to section 5 of the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465, sets the context for the County's request to the Secretary on June 16, 2006 and for the Secretary's response. The applicable statutes required the Secretary to determine whether the Chico parcel qualified as a "restoration of lands" allowing gaming under section 20 of the IGRA, 25 U.S.C. § 2719(b)(1)(B)(iii). In the Tribe's case, Interior's Office of the Solicitor requested that NIGC assume primary responsibility for providing a legal opinion on this question. The Secretary also had to examine the environmental effects of taking the Chico parcel into trust under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370f. Only if the "restoration of lands" and environmental determinations favored granting the Tribe's application could the Secretary act under the IRA to approve the Tribe's application to take the Chico parcel into trust for, in part, casino gaming. *See TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 856–57 (D.C. Cir. 2006). In "mak[ing] any decision or determination . . . with respect to a federally recognized Indian tribe," the Secretary could not subclassify a tribe by denying it privileges and immunities

available to other federally recognized tribes. 25 U.S.C. § 476(f).[1]

The County has long been involved with Interior regarding the Tribe's efforts to locate a parcel of land qualifying as a "restoration of lands" under section 20 of the IGRA. As early as 2002, when Interior was considering the "restoration of lands" determination, a member of the Butte County Board of Supervisors had written to the NIGC urging the Secretary to take the Chico parcel into trust because the Tribe "has historical and cultural ties to the land planned for the reservation," stating that "[i]t was part of a large area that was to be deeded to the Mechoopda under treaties signed in the mid-1800s," and that the Tribe's proposed casino on the Chico parcel "would allow them to reestablish a connection to the soil of their ancestors." Letter from Curt Josiassen, Member of the Butte County Board of Supervisors (July 26, 2002). The letter also referenced the fact that the County and the Tribe had discussed the proposed gaming site in a series of meetings. Articles in Butte County newspapers emphasized the Tribe's connection to the Chico parcel. *See, e.g.*, Editorial, *It's a Gamble, but at Least It's a Chance*, THE ENTERPRISE–RECORD, Chico, CA, Apr. 9, 2002 ("Chico and

---

[1] Section 476(f) provides:

Departments or agencies . . . shall not promulgate any regulation or make any decision or determination . . . with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

25 U.S.C. § 476(f). *See also* 25 U.S.C. § 476(g); 25 U.S.C. § 479a, Pub. L. 103-454, 108 Stat. 4791 Note (1994); 70 Fed. Reg. 71,194, 71,195 (Nov. 25, 2005).

much of Butte County is literally built on the bones of the Mechoopda.").

The Tribe was originally federally recognized in the Treaty of 1851, in which the United States promised to the Tribe land located near the ranch of General John Bidwell.[2] However, the Treaty was never ratified and the land was not turned over to the Tribe. *See* Anne H. Currie, *Bidwell Rancheria*, 36 CAL. HIST. SOC'Y Q. 313, 315–16 (Dec. 1957). As a result of a change in federal Indian policy and law, the Tribe's federal recognition was withdrawn in 1967[3] and assets of its rancheria were distributed. *See* 32 Fed. Reg. 7981, 7981–82 (June 2, 1967). The Tribe sued and in 1992 was reinstated to its former federal status as part of a stipulated judgment between the Tribe, the United States, and the City of Chico in Butte County, California. *See Notice of Reinstatement to Former Status for the Mechoopda Indian Tribe of the Chico Rancheria*, 57 Fed. Reg. 19,133 (May 4, 1992); Order for Entry of Judgment and Judgment, *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria, et al. v. United States*, No. C-86-3660-VRW (N.D. Cal. 1992). The Tribe's attempt to have the Secretary take a parcel of land into trust in 1996 failed under the Secretary's then–interpretation of section 20 of the IGRA. However, after litigation required the Secretary to adopt a broader interpretation, the Tribe requested the Secretary to take the Chico parcel into trust in November 2001, finished acquiring the Chico parcel in December 2001, and on March 26, 2002, requested the NIGC to determine whether the

---

[2] *See* Treaty Made and Concluded at Bidwell's Ranch, on Chico Creek, August 1, 1851, Between O.M. Wozencraft, United States Indian Agent, and the Chiefs, Captains and Head Men of the Mi-Chop-Da, Es-Kuin, etc., Tribes of Indians.

[3] *See* California Rancheria Act, Pub. L. No. 85-671, 72 Stat. 619 (1958), *amended by* Pub. L. No. 88-419, 78 Stat. 390 (1964).

Chico parcel would qualify as a gaming site under the restoration of lands provisions of section 20 of the IGRA.

The Tribe's historical status with respect to the Chico parcel was confirmed in a comprehensive determination by the NIGC in 2003 in which Interior's Solicitor concurred. The 2003 determination concluded that the Tribe had proven its historical and cultural connection to the Chico parcel and that the parcel qualified as restored Indian lands under IGRA and NIGC regulations and should be taken into trust. *See* NIGC 2003 Determination at 10–11, 12 (Mar. 14, 2003). The determination considered the factual circumstances of the Tribe's acquisition of the Chico parcel, the location of the Chico parcel (about ten miles from the Tribe's former rancheria on the Bidwell ranch, the "Chico Rancheria"), and the Tribe's historical and cultural nexus to it as well as the temporal relationship between the Tribe's restoration to federal recognition in 1992 and the Tribe's acquisition of the Chico parcel in 2001, concluding that all of these factors supported finding that taking the Chico parcel into trust would constitute a "restoration of lands" to the Tribe for purposes of IGRA section 20. In reaching this conclusion the determination relied on the key studies of the origins of the Tribe. These included the field notes of ethnologist C. Hart Merriam, who had interviewed Chico Rancheria residents in 1903, 1919, and 1923 regarding the locations of Mechoopda villages; the 2001 declaration of Craig Bates, the curator of ethnography for Yosemite National Park — who had researched and published over one hundred articles and papers on Native Americans, sixteen of which directly related to the history and culture of the Maidu Indians of California, including the Mechoopda Tribe of Chico Rancheria — that the Tribe is the sole surviving group of the Northwestern Valley Maidu Indians and has historical and cultural connections to the Chico parcel; and reports prepared in 2002 by ethnographer and historian Brian Bibby, an expert on California Indian communities, describing

connections among the Tribe, the Chico parcel, and the historical villages of the Mechoopda. The 2003 determination noted that the Chico parcel was within the boundaries of historical Mechoopda village locations and within the boundaries of the land promised to the Mechoopda in the unratified Treaty of 1851.

Also part of the administrative record was the Currie report, published in 1957 in the *California Historical Society Quarterly*, tracing the history of the Mechoopda Tribe since 1849, when General John Bidwell purchased 22,000 acres of land including land the Mechoopda Tribe occupied. *See also* Editorial, THE ENTERPRISE–RECORD, Apr. 9, 2002 ("The Mechoopda did most of the mining work that made John Bidwell rich and did much of the work on his ranch that allowed him to prosper."). The 2003 determination explained that although General and Mrs. Bidwell had established a Mechoopda Indian village for their Indian employees, and Mrs. Bidwell had deeded a 26-acre rancheria in trust for the Tribe, this land was lost after the Tribe's federal recognition was terminated in 1967, and that the city of Chico, California now occupies the site of the Tribe's former rancheria. Further, the 2003 determination noted that the 1992 stipulated judgment stated the Tribe could not attempt to reestablish the boundaries of its former rancheria.

The Tribe formally applied to the Secretary on March 19, 2004 to take the Chico parcel into trust as restored lands under IGRA section 20. On April 8, 2004, the Secretary issued notice of and sought comment on the Tribe's application to take the Chico parcel into trust, requesting comments within thirty days from numerous California state and county officials. *See* 25 C.F.R. § 151.10. On July 23, 2004 the County wrote the Tribe that, in view of its discussions with the Tribe about mitigation measures, the County "withdraws any formal concerns regarding the proposed location of the casino and the placement of the 650

acres of land [i.e., the Chico parcel] into trust status." Letter from Paul McIntosh, Chief Administrative Officer for Butte County, to Steve C. Santos, Tribal Chairman, Mechoopda Indian Tribe of Chico Rancheria (July 23, 2004).

A year later, by letter of August 24, 2005 to the Secretary, the NIGC, and the Solicitor's Office, the Tribe expressed concern that the County not "stall the Project" by delaying agreement on mitigation measures. In a second letter to the Secretary, dated October 25, 2005, the Tribe reported that after five years of discussion about the Chico parcel and the Tribe's expenditure of over seven million dollars, the County was now calling for the consideration of other sites.

On March 1, 2006, the County informed the Secretary that it opposed development of a casino on the Chico parcel, noting environmental objections. *See* Letter from Dennis Whittlesey, Butte County Special Counsel for Gaming, to Gale Norton, Secretary of the Interior (Mar. 1, 2006). However, three months later the County shifted gears, challenging the Tribe's existence for the first time, and making a new request of the Secretary. It is this request that underlies the County's challenges to the approval of the Tribe's application to take the Chico parcel into trust.

## II.

By letter of June 16, 2006 to the Secretary, the Board of Supervisors of Butte County asked the Secretary to "reject" the legal determination made in 2003 by the NIGC and the Solicitor that the Mechoopda Tribe is a historical tribe whose Chico parcel qualifies to be taken into trust as restored lands. Informing the Secretary that the County opposed the Tribe's application for restored lands, the County advised its position now was that "the tribal members[']" only "'homeland'" was "the former Chico

Rancheria" at the Bidwell Ranch and they "cannot demonstrate any ties or connections to any other property." Letter from Dennis Whittlesey, Butte County Special Counsel for Gaming, to Dirk Kempthorne, Secretary of the Interior, at 5 (June 16, 2006) ("County Letter of June 2006"). The letter also stated:

> Butte County does not contest the Mechoopda's federal recognition. Indeed, we acknowledge that the Department of the Interior has the legal right under the Indian Reorganization Act to extend federal recognition to groups of disparate Indians residing in a common place. However, the Mechoopda is not a historical tribe as is documented by the Beckham Report. To the contrary, it was a "Rancheria Tribe" and the only land ever occupied by the people who ultimately were recognized as a tribe was the Bidwell Ranch property set aside for their residency by the Bidwells.

County Letter of June 2006 at 5.

The Beckham Report, dated January 2006, was submitted to the Secretary on June 16, 2006, and forwarded by the County to the NIGC on July 14, 2006. Prepared by Stephen Dow Beckham, a history professor at Lewis & Clark College in Portland, Oregon, the report addressed the Bidwells' history, including their efforts to protect Indians and provide lands for them to live on, and the ancestry of the Indians working for them who lived on the Chico Rancheria set aside for them by the Bidwells. Beckham concluded those Indians were "never an Indian tribe with a federal government-to-government relationship," County Letter of June 2006 at 5 (quoting the Beckham Report at 50), and so were not a historical tribe with ties to the historical Mechoopda. In contrast to the comprehensive historical analysis of the Tribe by the NIGC and the Solicitor in 2003, the Beckham Report focused on the Chico

Rancheria and did not address whether the Secretary should take the Chico parcel into trust under section 5 of the IRA. The Report also did not address the Bates, Bibby, or Currie studies relied on in the 2003 determination. Neither did it mention the Tribe's original federal recognition in 1851. That is, Beckham opined primarily that the Mechoopda's inclusion of people of mixed ancestry and surviving Indians from other Maidu villages and tribes terminated tribal existence at the Chico Rancheria.

The Secretary responded to the County's June 16, 2006 request by letter of August 28, 2006, from Acting Deputy Assistant Secretary George T. Skibine. The Secretary acknowledged the County's opposition to the Tribe's application to take the Chico parcel into trust and recognized that the County now was requesting the Secretary to reject the 2003 determination that the parcel would qualify as a "restoration of lands" under IGRA section 20. The Secretary declined to do so: "We are not inclined to revisit this decision now because the Office of the Solicitor reviewed this matter in 2003, and concurred in the NIGC's determination of March 14, 2003."

In *Tourus Records,* 259 F.3d 731, this court held that an agency fulfills its obligation under 5 U.S.C. § 555(e)[4] to provide "a brief statement" of the grounds for denying an interested party's request where internal agency memoranda clarify the

---

[4] Section 555(e) provides:

Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial.

5 U.S.C. § 555(e).

agency's conclusory denial, *id.* at 737 (quoting 5 U.S.C. § 555(e)), 739. The court explained that the requirement for an agency to provide a "brief statement" serves two purposes: first, to ensure that the agency has given careful consideration to the request, and second, to give the party an opportunity to inform the agency of any errors it may have made and to facilitate judicial review. *Id.* at 737. The court emphasized, however, that "nothing more than a 'brief statement' is necessary" as long as the agency explains "why it chose to do what it did." *Id.* (internal quotation marks omitted). In that case the court held the agency's denial of an *in forma pauperis* request, challenged as being arbitrary and capricious, would have been insufficient, standing alone, because the conclusory declaration that the requestor's affidavit of indigency was "inadequately supported" did not explain why the agency regarded the request as unsupported and was not "'self-explanatory,' 5 U.S.C. § 555(e)" from the statement's context. *Id.* The agency's statement of denial "provide[d] no basis upon which [the court] could conclude that it was the product of reasoned decisionmaking." *Id.* However, because internal memoranda "represent[ing] the 'contemporaneous explanation of the agency decision'" clarified the agency's rationale, the court determined a remand was unnecessary and affirmed the agency's denial. *Id.* at 738 (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973)). The same analysis applies here.

Notwithstanding its brevity, the Secretary's letter revealed, on its face, familiarity with the substance of the Beckham Report and recognition that the Beckham Report sought to reopen the question of the Tribe's historical status, a matter comprehensively addressed in the 2003 determination. The Secretary refuted the assertions by the County and the conclusion of the Beckham Report — namely that the Tribe had no identity as a tribe before its federal recognition in 1992, even on the Chico Rancheria — by pointing to the 2003 determination,

which addressed the Chico Rancheria Indians' status and the broader reach of the Tribe's history, including its federal recognition in 1851, *supra* note 2.  The laconic denial letter also reflected the fact that the Beckham Report did not mention the land being considered for trust status, instead challenging the Tribe's existence and the ability of Interior to restore any land at all to the Tribe.

The rationale behind the Secretary's decision is "self-explanatory," 5 U.S.C. § 555(e), upon comparing the 2003 determination and the Beckham Report.  The Beckham Report addressed only a portion of the Tribe's historical record and did not challenge, much less identify any deficiencies in, the expert studies relied upon in the 2003 determination.  The report also did not refer to the Tribe's broader history.  For example, it omitted any mention of the Tribe's initial recognition in 1851, even thought it took place at the Bidwell Ranch, *supra* note 2, and it did not otherwise address the legal significance of that status. Given the comprehensive analysis in 2003 based on undisputed expert studies of the Tribe's history and connection to the Chico parcel, the County's 2006 submission gave the Secretary no reason to revisit that matter, particularly as the County's request was based in Interior's view, as reflected in the administrative record discussed *infra*, on the outlawed concept of subcategories of federally recognized tribes, subcategories that were thus beyond the Secretary's authority to recognize.  *See supra* note 1.  Rather, in view of the County's previous efforts to delay approval of the Tribe's application, the Secretary had little reason to conclude other than that the County's latest attempt to derail approval presented no basis for revisiting the matter addressed three years earlier in the comprehensive determination by the NIGC and the Solicitor.

Furthermore, the Secretary's letter "does not stand as the sole 'explanation' of the agency's decisionmaking rationale."

*Tourus Records*, 259 F.3d at 738. The rationale for the Secretary's decision not to revisit the matter, and instead to rely on the comprehensive and effectively unchallenged 2003 determination by the NIGC and the Solicitor, was elaborated in contemporaneous documents in the administrative record that were relied upon by the Assistant Secretary for Indian Affairs who, on behalf of the Secretary, made the decision to approve the Tribe's application. First, Interior's response to comments during the NEPA proceeding described the County's position in its August 11, 2006 letter, which restated the views expressed in its June 16, 2006 letter, as "challeng[ing] the [revised environmental assessment ("REA")] project site's historical and cultural significance to the Mechoopda Tribe." Response to Comments at 10. This response indicated that Interior understood the County and the Beckham Report to be denying the Tribe's existence at the Chico Rancheria on the thesis that the "modern" Tribe had no connection with the "historical" Mechoopda Tribe that occupied vast areas of Butte County and hence had no historical connection to any land. The County's June 16, 2006 and February 15, 2008 letters to the Secretary, and its August 11, 2006 letter to the Regional Director of Interior's Bureau of Indian Affairs, reaffirm the correctness of this interpretation of the Beckham Report as seeking to parse the Tribe's existence in a manner that undermined its status as a federally recognized tribe.

Second, the Response to Comments described the Beckham Report, the 2003 determination, and the Secretary's letter declining to revisit that determination, concluding that the Tribe is federally recognized and listed as such pursuant to federal statute and that under a statute enacted in 1994 only Congress can terminate that status. *See* Response to Comments at 10–11; *supra* note 1. The response emphasized that the Beckham Report was addressing "[i]ssues regarding tribal membership, historical land ownership and aboriginal territory," Response to Comments

at 10, that the Tribe is now federally recognized, that it "was first recognized as a sovereign tribal entity in 1851, when the United States first executed a treaty, never ratified, with the Tribe," and that only Congress can terminate the federal recognition of a Tribe, *id.* at 11. This is a direct response to the assertions of the County and the conclusion of the Beckham Report in 2006. The response was prepared by Interior's Pacific Regional Office, and it was that office's 2007 memorandum recommending that the Chico parcel be taken into trust on which the Secretary, acting through the Assistant Secretary for Indian Affairs, relied when he approved on March 14, 2008 the Tribe's application to take the Chico parcel into trust as restored lands.

Thus, the "brief statement" in the Secretary's August 28, 2006 letter responding to the County's request was adequate under 5 U.S.C. § 555(e), because it explained "why [the Secretary] chose to do what [the Secretary] did," *Tourus Records*, 259 F.3d at 737 (internal quotation marks omitted), and the rationale for the Secretary's decision to rely on the 2003 determination was self-explanatory. The Beckham Report did not purport to address the Tribe's history comprehensively as did the 2003 determination and did not suggest the expert studies on which the 2003 determination relied were flawed. Although the court "may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery*, 332 U.S. 194, 196 (1947)," the court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Contemporaneous agency memoranda elaborated the Secretary's rationale, making explicit that what the County and the Beckham Report were suggesting was that the Indians who lived on the Chico Rancheria had no tribal existence and so could show no connection to the Chico parcel or any other land, and thus that

the Secretary should reject the 2003 determination and treat the federally recognized Tribe as entitled to diminished privileges compared to other federally recognized tribes. The administrative record further reveals that the Secretary considered the County's views and the Beckham Report in issuing, through the Assistant Secretary for Indian Affairs, a Finding of No Significant Impact ("FONSI"), stating that "[t]his [FONSI] conclusion is based on the analysis contained in the REA, public comments made on the REA, *the response to those comments*, and the mitigation imposed." Carl Artman, Assistant Secretary for Indian Affairs, FONSI for the Proposed Mechoopda Indian Tribe Chico Casino Fee-to-Trust Acquisition, at 19 (Jan. 4, 2008) (emphasis added). Because the NEPA process is a legal requirement with which the Secretary had to comply, the statement that the Secretary based his conclusions on the Response to Comments is not gratuitous.

The Secretary's response to the County is consistent with our precedent that an agency need not restart its analysis whenever a new report is submitted. *Cf. Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1059 (D.C. Cir. 2001); *Pers. Watercraft Indus. Ass'n v. Dep't of Commerce*, 48 F.3d 540, 542–43 (D.C. Cir. 1995). Otherwise, an agency could be "reasonably concerned that an unyielding avalanche of information might overwhelm an agency's ability to reach a final decision," *Village of Bensenville v. FAA*, 457 F.3d 52, 71 (D.C. Cir. 2006), or that parties could "behave like Penelope,[5] unravelling each day's work to start the web again the next day," *Western Coal Traffic*

---

[5]
> So every day she wove on the great loom—
> but every night by torchlight she unwove it;
> and so for three years she deceived the Akhaians.

Homer, *The Odyssey*, Book II, lines 112-114 (Robert Fitzgerald trans. 1961).

*League v. ICC*, 735 F.2d 1408, 1411 (D.C. Cir. 1984).  The effect of the County's 2006 submission of the Beckham Report was to ask the Secretary to start the fee-to-trust process for the Chico parcel all over again, when the record shows the County had opportunities, and took advantage of them, to make its views known before and after the 2003 legal determination was rendered.  Given the limited analysis in the Beckham Report, the Secretary could reasonably decide, for the reasons the contemporaneous administrative record reveals, to rely on the expert evidence assembled by the NIGC in preparing the comprehensive 2003 determination showing the Tribe's historical connection to the Chico parcel.  *See City of Roseville v. Norton*, 348 F.3d 1020, 1027 (D.C. Cir. 2003).  Although the Secretary did not publish his final decision of March 14, 2008 to take the Chico parcel into trust until May 8, 2008, that did not mean the County's 2006 submissions required the Secretary, like Penelope, to begin anew an examination of the issue of the Tribe's status as a historical tribe with connections to the Chico parcel, a matter previously considered in a comprehensive determination by the NIGC and the Solicitor that remained effectively unchallenged.

**III**.

Construing the County's June 16, 2006 letter as a challenge to the restored lands determination of 2003, rather than to the Tribe's existence, the County fails to show that Interior's determination that the Mechoopda Tribe has a significant historical and cultural nexus to the Chico parcel was arbitrary and capricious.  In this "'classic example of a factual dispute the resolution of which implicates substantial agency expertise,'" the court "only inquire[s] whether the agencies have based their policy choices on reasonable expert evidence," and "because the agencies have relied upon sufficient expert evidence to establish a rational connection between the facts and the choice made, it

was not arbitrary and capricious for them" to weigh the competing expert opinions as they did. *Wis. Valley Improvement Co. v. FERC*, 236 F.3d 738, 747 (D.C. Cir. 2001) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376 (1989)) (internal quotation marks and citation omitted). The Secretary and the NIGC satisfied their obligations under the Administrative Procedure Act, 5 U.S.C. § 706, by "enabl[ing] [the court] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Milk Indus. Found. v. Glickman*, 132 F.3d 1467, 1476 (D.C. Cir. 1998) (quoting *Republican Nat'l Comm. v. Fed. Election Comm'n*, 76 F.3d 400, 407 (D.C. Cir. 1996)) (ellipsis in original). The County failed to show that the challenged decisions were not based on consideration of the relevant factors, much less that its views or the Beckham Report were ignored or unevaluated. *See State Farm*, 463 U.S. at 43; *cf., e.g.*, *City of Waukesha v. EPA*, 320 F.3d 228, 257–58 (D.C. Cir. 2003).

The County's contentions reduce to an argument that the Tribe, descending from Indians who worked for the Bidwells in the mid-nineteenth century, lacks a connection to the historical Mechoopda Tribe and thus lacks a connection to the Chico parcel. The administrative record is replete with evidence that establishes the Tribe is the historical Mechoopda tribe with the requisite connections. The 2003 determination cited expert reports and materials that the Beckham Report did not consider or challenge, and the Beckham Report omitted mention of the Tribe's federal recognition in the unratified 1851 Treaty and its significance. Neither Currie nor Bates nor Bibby, who reviewed Merriam's field work, concluded the Tribe had no relation to the historical Mechoopda Tribe. These experts instead viewed the Tribe as connected to the historical Mechoopda Tribe. The County's fundamental argument that the Tribe lost a connection to the historical Mechoopda Tribe by incorporating people of mixed race and Indians from Northwestern Valley Maidu

villages and other tribes finds no support in the law. *See, e.g.*, *City of Roseville*, 348 F.3d at 1022. Moreover, the records cited in the Beckham Report did not show that the Tribe included people with no Indian ancestry (except for some spouses), but rather that many tribal members identified their ancestors as Mechoopda Tribe members or survivors of other Maidu tribes from the region.

Looking to the full historical reach of the Mechoopda and Northwestern Valley Maidu, rather than narrowly to the time at the Chico Rancheria, was not arbitrary or capricious. *See id.* at 1027. In submitting the Beckham Report the County did not suggest that it represented more than another view of a limited aspect of the historical record considered in the 2003 determination by the NIGC and the Solicitor. Even in challenging the Bibby Report in its August 11, 2006 letter, the County cited only the Beckham Report and ignored the other expert reports relied upon in the 2003 determination. Both the Secretary's August 28, 2006 letter and contemporaneous agency memoranda revealed familiarity with the County's views and the substance of the Beckham Report, and the Secretary, through the Assistant Secretary for Indian Affairs, in approving the Tribe's application relied on the agency commentary addressing the report's (and thus the County's) approach. The Secretary and the NIGC reasonably looked to the full history of the Mechoopda and Northwestern Valley Maidu rather than simply the story of the Chico Rancheria, as the Beckham Report did. *See id.* at 1027.

Accordingly, because the court, contrary to our precedent in *Tourus Records*, in finding a violation of 5 U.S.C. § 555(e) turns a blind eye to the evidence in the administrative record that explains the Secretary's decision not to revisit the matter addressed in the 2003 determination, and because the challenged decisions by the Secretary and the NIGC are supported by

substantial evidence in the record, I would affirm the grant of summary judgment to the Secretary, the NIGC, and the Tribe, and I respectfully dissent.